

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-28-2003

# In Re: PPI Entr

Precedential or Non-Precedential: Precedential

Docket 01-4140

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"In Re: PPI Entr " (2003). *2003 Decisions.* Paper 673.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/673

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed March 28, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-4140

In Re: PPI ENTERPRISES (U.S.), INC.
and POLLY PECK PRODUCE, INC.,
Debtors

SHELDON H. SOLOW,
d/b/a SOLOW BUILDING COMPANY

v.

PPI ENTERPRISES (U.S.), INC.,
POLLY PECK PRODUCE, INC.,
ARVI LIMITED and PPI HOLDINGS, B.V.

Sheldon H. Solow,
d/b/a Solow Building Company,
Appellant

On Appeal from the United States District Court
for the District of Delaware
D.C. Civil Action No. 00-cv-00469
(Honorable Roderick R. McKelvie)

Argued July 15, 2002

Before: SCIRICA, ALITO and FUENTES, *Circuit Judges*

(Filed March 28, 2003)

STEPHEN J. SHIMSHAK, ESQUIRE
 (ARGUED)
JAMES H. MILLAR, ESQUIRE
Paul, Weiss, Rifkind, Wharton &
 Garrison
1285 Avenue of the Americas
New York, New York 10019-6064

WILLIAM A. HAZELTINE, ESQUIRE
Potter Anderson & Corroon
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, Delaware 19899

   Attorneys for Appellant

JAMES L. PATTON, JR., ESQUIRE
 (ARGUED)
TIMOTHY E. LENGKEEK, ESQUIRE
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899

   Attorneys for Appellees,
   PPI Enterprises (U.S.), Inc.,
   Polly Peck Produce, Inc.,
   ARVI Limited and PPI Holdings,
   B.V.

CHARLENE D. DAVIS, ESQUIRE
 (ARGUED)
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, Delaware 19899

   Attorney for Appellees,
   ARVI Limited and PPI Holdings,
   B.V.

---

**OPINION OF THE COURT**

---

SCIRICA, *Circuit Judge*:

This is an appeal by a commercial landlord who contends a Chapter 11 bankruptcy was filed only to frustrate his collection of rent. At issue is an interpretation of Bankruptcy Code § 502(b)(6) and the Code's good faith requirements.

**I.**

Sheldon Solow owns a Manhattan office tower at 9 West 57th Street. On August 9, 1989, he leased 10,000 square feet to PPI Enterprises ("PPIE"), a Delaware corporation, for its corporate headquarters. The lease ran for ten years, requiring annual payments (in monthly installments) of $620,000 for five years and $650,000 thereafter. Polly Peck International, PLC, a United Kingdom corporation and the indirect corporate parent of PPIE, guaranteed these commercial lease obligations.[1] Sanwa Bank issued a stand-by letter of credit to Solow, on behalf of PPIE, in the amount of $650,000.

Over time, Polly Peck's financial status unraveled and insolvency proceedings commenced in Great Britain. On October 25, 1990, the Chancery Division of the High Court of Justice entered an administration order[2] for Polly Peck and appointed three administrators for the company. As Polly Peck's subsidiary, PPIE faced credit cancellations and defaults exceeding $17 million.[3]

---

1. There are two debtors in these jointly administered cases: PPIE and Polly Peck Produce, Inc., a wholly owned subsidiary of PPIE. The joint Chapter 11 plan, and the order confirming it, contemplate that these two estates will be consolidated upon the effective date of the plan. Therefore, we will jointly refer to the two entities as "PPIE."

2. Administration under the Insolvency Act of 1986 is the closest analogue in British law to Chapter 11 bankruptcy relief.

3. Meanwhile, Solow contends PPIE engaged in transactions designed to reduce his eventual damages claim. In January 1990, PPIE acquired a

In September 1991, PPIE abandoned its corporate headquarters in Manhattan and ceased paying rent to Solow. On October 8, 1991, Solow delivered PPIE written notice of default under the lease. After PPIE failed to cure the default, Solow gave notice on October 21, 1991, of his intent to terminate the lease. Remaining rent due under the leasehold agreement totaled approximately $5.86 million. Solow subsequently drew on Sanwa Bank's letter of credit, applying it in lieu of monthly rent payments between October 1991 and July 31, 1992. By the latter date, the letter of credit was exhausted.

On October 25, 1991, Solow sued PPIE and Polly Peck in the United States District Court for the Southern District of New York. On November 13, 1992, the district court granted Solow partial summary judgment, holding PPIE wrongly terminated its lease, but did not address possible damages. On March 4, 1996, almost four and one half years after filing its initial lawsuit and after the failure of settlement negotiations, Solow asked the district court to schedule a damages trial. On the eve of that proceeding, PPIE filed for Chapter 11 bankruptcy in Delaware. PPIE stated it had four objectives: (1) concluding the Polly Peck "wind-down"; (2) "liquidating" PPIE; (3) invoking provisions to reject a restriction on its ability to sell the Del Monte

two percent interest in Del Monte Food Co. for $12.6 million. PPIE transferred the stock to Polly Peck for an accounting credit. In January 1991, Polly Peck's administrators sold Standard Fruit capital stock owned by PPI Holdings B.V., PPIE's direct parent, to a third party, conveying the $15 million in proceeds to Sanwa Bank. Although PPIE owed no obligation to Sanwa Bank, the payment was treated as an inter-company "loan" to PPIE. Solow suggests no legitimate lender would have made such a loan, given PPIE's inability to repay. In July 1991, allegedly to avoid paying $87,000 in withholding taxes, the administrators "sold" Polly Peck's interest in Del Monte to PPIE for $12.6 million, the same amount Polly Peck had paid PPIE two years earlier. PPIE's vice president for finance then reduced the balance sheet value of the Del Monte stock to $3.5 million. But the inter-company "indebtedness" of $12.6 million remained unchanged, so it continued to accumulate interest. PPIE eventually owed $50 million in "inter-company debt" to BV and Polly Peck.

stock; and (4) limiting Solow's lease termination damages under Bankruptcy Code § 502(b)(6).

On August 9, 1996, Solow filed a proof of claim with the Bankruptcy Court, reducing his alleged damages to $4,757,824.94.[4] Then, in December 1996, Solow moved to dismiss the Chapter 11 filing for bad faith. Solow alleged PPIE's bankruptcy was a sham filing designed to create value for Polly Peck and its creditors at his expense, and that the bankruptcy served no legitimate purpose. According to Solow, PPIE did not intend its bankruptcy filing to effectuate a corporate reorganization, because the company had no ongoing business, only one remaining employee, and "no assets other than stock certificates representing a 2% interest in Del Monte Foods Company." After an evidentiary hearing, the Bankruptcy Court in January 1997 denied the motion without prejudice.[5]

On March 31, 1998, PPIE filed its bankruptcy plan ("Plan"), dividing administrative claims and priority tax claims into four classes.[6] After providing for the four-class division, the Plan stated: "The treatment of and consideration to be received by holders of Allowed Claims and Interests pursuant to this Article IV of the Plan shall be

---

4. The reduction is attributable to two factors: (1) Solow had re-let a portion of the Manhattan premises, mitigating his potential relief, and (2) as noted, Solow had received $650,000 under the Sanwa Bank letter of credit.

5. In the meantime, Del Monte agreed to re-purchase its stock from PPIE for $1.6 million, subject to higher offers. Solow objected, arguing stock transfer restrictions inhibited bidding by third parties. After Del Monte lifted the restriction, Del Monte and Solow engaged in an exchange of bids, with Solow eventually winning at a price of $11 million. A few months later, Solow resold the Del Monte stock for at least $30 million to Texas Pacific Group, generating a profit that exceeded $19 million.

6. Class 1 consisted of "priority claims"; Class 2 included "non-insider general unsecured claims." Members of Classes 1 and 2 were to be paid, at 100 cents on the dollar, in "cash and other consideration as required." Class 3, encompassing "affiliate claims," and Class 4, encompassing "interests," were to be paid in "remaining cash and the assignment of certain debtor claims or causes of action." Those with Class 3 "affiliate claims," Solow alleges, were the "insiders" owing more than $50 million to PPI Holdings B.V., PPIE's direct corporate parent, and Polly Peck.

in full and complete satisfaction, settlement, release and discharge of such Claims and Interests. The Debtors' obligations in respect of such Claims and Interests shall be satisfied in accordance with the terms of this Plan."

The Plan treated Solow's claim as a "Class 2 non-insider general unsecured claim." PPIE contended Plan approval by the classes of creditors was unnecessary since none were impaired. Nonetheless, PPIE solicited votes from Classes 1, 2, and 3. Only two of seven ballots were returned from Class 2 — Solow's "no" vote and one "yes" vote. With no clear majority, Solow contends Class 2 effectively rejected the Plan.[7]

Solow renewed his motion to dismiss on April 6, 1998, contending his vote against the Plan had not counted because his claim was improperly classified as "unimpaired." Over a four-day period, the Bankruptcy Court heard evidence on the debtors' objection to Solow's claim; Solow's renewed motion to dismiss; and Solow's objections to the Plan's confirmation. On December 30, 1998, the Bankruptcy Court determined Solow's claim was subject to the statutory cap of 11 U.S.C. § 502(b)(6) and reduced by application of the letter of credit; the bankruptcy was filed in good faith; and as an "unimpaired creditor," Solow was deemed to have accepted the plan. *In re PPI Enters.*, 228 B.R. 339 (Bankr. D. Del. 1998) (Walsh, J.).

The United States District Court for the District of Delaware affirmed without opinion and this appeal followed.[8]

---

7. Once claims have been formed and certain classes have been identified as "impaired," at least one impaired class must vote in favor of a Chapter 11 plan. Otherwise, the court will not confirm the plan. Section 1129(a) provides: "The court shall confirm a plan only if all of the following requirements are met . . . (10) [i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." Within the impaired class voting for the plan, "creditors holding at least two-thirds in amount and more than half in number of the allowed claims" must approve it. 11 U.S.C. § 1126(c).

8. Under the Amended and Restated PPIE Memorandum of Agreement, the debtors and the "insiders" settled to "avoid litigation." BV (PPIE's direct corporate parent) and Arvi Ltd. (an affiliate of BV) will receive all remaining cash and an assignment of causes of action.

## II.

The Bankruptcy Court had subject matter jurisdiction under 28 U.S.C. §§ 1334 and 157. The District Court had jurisdiction over the Bankruptcy Court's order under 28 U.S.C. § 158(a). We have jurisdiction under 28 U.S.C. § 158(d). We review the Bankruptcy Court's "legal determinations de novo, its factual findings for clear error, and its exercises of discretion for abuse thereof." *In re Cont'l Airlines*, 203 F.3d 203, 208 (3d Cir. 2000).

## III.

The central issue on appeal is whether the doctrine of impairment precludes Solow from having voting rights against PPIE's Chapter 11 bankruptcy plan.

"Impairment" is a term of art crafted by Congress to determine a creditor's standing in the confirmation phase of bankruptcy plans. *In re L&J Anaheim Assoc.*, 995 F.2d 940, 942-43 (9th Cir. 1993). Each creditor has a set of legal, equitable, and contractual rights that may or may not be affected by bankruptcy. If the debtor's Chapter 11 reorganization plan does not leave the creditor's rights entirely "unaltered," the creditor's claim will be labeled as impaired under § 1124(1) of the Bankruptcy Code. If the creditor's claim is impaired, the Code provides the creditor with a vote that, depending on the value of the creditor's claim, may be sufficient to defeat confirmation of the bankruptcy plan.

The Bankruptcy Code creates a presumption of impairment "so as to enable a creditor to vote on acceptance of the plan." *In re Monclova Care Ctr., Inc.*, 254 B.R. 167, 178-79 (Bankr. N.D. Ohio 2000); *In re Seasons Apartments, L.P.*, 215 B.R. 953, 958 (Bankr. W.D. La. 1997). Under 11 U.S.C. § 1124(1), the presumption of impairment is overcome only if the plan "leaves unaltered the [creditor's] legal, equitable, and contractual rights."[9] The burden is placed on the debtor to demonstrate the plan leaves the creditor's rights unaltered.

---

9. A second exception to the presumption is found in 11 U.S.C. § 1124(2) but it is not relevant here.

The Bankruptcy Court here began by reviewing 11 U.S.C. § 502(b)(6). The court determined the Plan did not impair Solow's legal, equitable, and contractual rights, since the limitation on Solow's potential recovery was dictated by § 502(b)(6), which was independent of the Plan. Solow contends application of § 502(b)(6) alters his claim and entitles him to vote against the Plan's confirmation. The question is whether the impairment sections of the Bankruptcy Code require such a result.

**A.**

**1.**

We begin with the language of the Bankruptcy Code. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989). As noted, § 1124(1) provides that a claim is impaired unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim . . . entitles the holder of such claim." Under § 101(5), a "claim" refers broadly to a creditor's right to recovery.[10] *See also Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991) ("We have previously explained that Congress intended by this language to adopt the broadest available definition of 'claim.'") (citations omitted).

Solow contends a broad definition of "claim" requires a finding of impairment whether the source of impairment is the plan or a statute. The Bankruptcy Court rejected

---

10. The section defines "claim" as:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured . . .

11 U.S.C. § 101(5).

Solow's argument, finding he "confuse[d] two distinct concepts: (i) plan impairment, under which the debtor alters the 'legal, equitable, and contractual rights to which [the] claim entitles the holder of such claim,' and (ii) statutory impairment, under which the operation of a provision of the Code alters the amount that the creditor is entitled to under nonbankruptcy law." *PPI Enters.*, 228 B.R. at 353.

The Bankruptcy Court relied on *In re American Solar King Corp.*, 90 B.R. 808 (Bankr. W.D. Tex. 1988), to reach its conclusion. In *Solar King*, a Chapter 11 corporate debtor sought confirmation of a modified reorganization plan. Certain parties already involved in litigation with the bankrupt company — doubtless concerned about reduced recoveries — challenged the plan. *Id.* at 812-13. The court recognized the operation of § 510(b)[11] in altering the petitioning creditors' claims, but found the reduction in the creditors' potential, nonbankruptcy recovery did not result in impairment. *Id.* at 819-22. The court reasoned:

> A closer inspection of the language employed in Section 1124(1) reveals "impairment by statute" to be an oxymoron. Impairment results from what the *plan* does, not what the statute does. A plan which "leaves unaltered" the legal rights of a claimant is one which, by definition, does not impair the creditor. A plan which leaves a claimant subject to other applicable provisions of the Bankruptcy Code does no more to alter a claimant's legal rights than does a plan which leaves a claimant vulnerable to a given state's usury

11. That section provides:

> For the purposes of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or an affiliate of the debtor, for damages arising from the purchase or sale of such a security, for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b).

laws or to federal environmental laws. The Bankruptcy Code itself is a statute which, like other statutes, helps to define the legal rights of persons, just as surely as it limits contractual rights. Any alteration of legal rights is a consequence not of the plan but of the bankruptcy filing itself.

*Id.* at 819-20; *see also In re Smith*, 123 B.R. 863, 867 (Bankr. C.D. Cal. 1991) ("[A] plan may limit payment of claims to 'the extent allowed,' without impairing them; for until claims are allowed, or deemed allowed, the holders thereof are not entitled to distribution from the bankruptcy estate.").[12]

Generally, we agree with the *Solar King* analysis. The relevant impairment language requires bankruptcy plans to leave unaltered those rights to which the creditor's "claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1). This language in § 1124(1) does not address a creditor's claim "under nonbankruptcy law." The use of a present-tense verb suggests a creditor's rights must be ascertained with regard to applicable statutes, including the § 502(b)(6) cap. In other words, a creditor's claim outside of bankruptcy is not the relevant barometer for impairment; we must examine whether the plan itself is a source of limitation on a creditor's legal, equitable, or contractual rights.

Under Solow's interpretation, every landlord-creditor's capped claim under § 502(b)(6) would be impaired and entitled to a vote. Yet this would make § 502(b)(6) a nullity, since, unlike some other Code sections, the limitation on damages under § 502(b)(6) is "absolute" and "is a limit based on fairness rather than a rule of convenience." 4 *Collier on Bankruptcy*, § 502.03, at 7a (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. 2002). Thus, PPIE could not offer a plan that departed from the § 502(b)(6)

---

12. Solow contends *Solar King* is inapposite. Because *Solar King* was decided six years before the repeal of 11 U.S.C. § 1124(3), he suggests the court did not have "the benefit of history demonstrating Congress's intent to enfranchise claimants not fully returned to non-bankruptcy status." But, as we discuss, the legislative history surrounding the 1994 repeal of § 1124(3) does not support this view.

limitation. Accordingly, we hold that where § 502(b)(6) alters a creditor's nonbankruptcy claim, there is no alteration of the claimant's legal, equitable, and contractual rights for the purposes of impairment under § 1124(1).

## 2.

The *Solar King* court adopted a similar rationale when interpreting § 510(b), which automatically subordinates security purchase and sale claims to the claims of general, unsecured creditors. The rationale for this Code section is that general creditors should not share in the risk of an unlawful issuance of securities. *See* 4 *Collier on Bankruptcy*, § 510.04, at 1. Like § 502(b)(6), this Code section is mandatory, not discretionary. To hold that its mere application in a bankruptcy proceeding causes impairment would nullify its meaning.

Further, as the Bankruptcy Court here noted, Solow's interpretation would create "perverse incentives" for all creditors, effectively urging them to file "inflated claims, disputed claims, or claims of questionable validity." Once those claims were reduced by operation of the Bankruptcy Code, under Solow's analysis, creditors would succeed in having their claims "impaired" and would receive a vote to defeat the plan.

In sum, PPIE's Chapter 11 Plan intends to pay Solow his "legal entitlement" and provide him with "full and complete satisfaction" of his claim on the date the Plan becomes effective. Solow is only "entitled" to his rights under the Bankruptcy Code, including the § 502(b)(6) cap. Solow might have received considerably more if he had recovered on his leasehold claims before PPIE filed for bankruptcy. But once PPIE filed for Chapter 11 protection, that hypothetical recovery became irrelevant. Solow is only entitled to his "legal, equitable, and contractual rights," as they now exist. Because the Bankruptcy Code, not the Plan, is the only source of limitation on those rights here, Solow's claim is not impaired under § 1124(1).[13]

---

13. Because we hold the Plan did not impair Solow's claim, we need not reach whether the proceedings required a vote of the creditors to confirm the Plan.

**B.**

Solow also contends Congress's 1994 repeal of 11 U.S.C. § 1124(3), a separate exception to the presumption of impairment, supports his broad definition of "claim." Before 1994, § 1124(3) specified that a creditor receiving full payment of an "allowed claim" was not impaired. This subsection, eliminated in 1994, provided:

> Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan — (3) provides that, on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to — (A) with respect to a claim, the allowed amount of such claim . . . .

11 U.S.C. § 1124(3) (repealed).

Interpreting this statute in 1994, one bankruptcy court held that § 1124(3) allowed a solvent debtor to pay the "allowed" claims of unsecured creditors in full, excluding postpetition interest, without risking impairment. *In re New Valley Corp.*, 168 B.R. 73, 77-80 (Bankr. D.N.J. 1994).[14] The *New Valley* court held that a portion of a creditor's claim that was not "allowed" under the Bankruptcy Code need not be paid after a bankruptcy filing, even if the claim would be recoverable in a non-bankruptcy context. *Id.* This decision contrasted with several cases holding that unsecured creditors of a solvent debtor must be paid in full, including postpetition interest, under the "fair and equitable" test of § 1129(b)(2). *E.g.*, *Consol. Rock Prods. Co. v. Dubois*, 312 U.S. 510 (1941); *Debentureholders Protective Comm.*, 679 F.2d at 264.

After the *New Valley* decision, Congress repealed § 1124(3). Relevant legislative history recited:

---

14. An impaired creditor in a solvent debtor case can demand postpetition interest under the "fair and equitable" test of § 1129(b)(2). *See Debentureholders Protective Comm. of Cont. Inv. Corp. v. Cont. Inv. Corp.*, 679 F.2d 264, 269 (1st Cir. 1982). "Unimpaired" creditors have no such rights.

> The principal change in this section is set forth in subsection (d) and relates to the award of post petition interest. In a recent Bankruptcy Court decision (*New Valley*), unsecured creditors were denied the right to receive post petition interest . . . . In order to preclude this unfair result in the future, the Committee finds it appropriate to delete section 1124(3) from the Bankruptcy Code. As a result of this change, if a plan proposed to pay a class of claims in cash in the full allowed amount of the claims, the class would be impaired, entitling creditors to vote for or against the plan of reorganization.

H.R. Rep. No. 103-835, at 47-48 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3356-57.

Solow contends this repeal established that creditors receiving cash equal to their "allowed claims," even including postpetition interest, were still impaired by bankruptcy filings. He claims the repeal was not limited to fact situations involving postpetition interest and that Congress "went beyond" the *New Valley* "problem," providing creditors with voting rights if a bankruptcy plan alters their nonbankruptcy rights in any manner. Some bankruptcy courts appear to have adopted this rationale. *See, e.g.*, *Seasons Apartments*, 215 B.R. at 955-56 ("While the Congressional Record reveals that Congress was most concerned about solvent debtors avoiding post-petition interest on unsecured claims, Congress repealed the entire subsection."); *In re Crosscreek Apartments, Ltd.*, 213 B.R. 521, 536 (Bankr. E.D. Tenn. 1997) ("In light of the deletion of subsection (3) to § 1124 by the Bankruptcy Reform Act of 1994, the court concludes that it is no longer a valid argument to assert that the plan proponent can render a claim unimpaired by paying the claim in full at confirmation."); *Equitable Life Ins. Co. of Iowa v. Atlanta-Stewart Partners*, 193 B.R. 79, 80 (Bankr. N.D. Ga. 1996) (concluding Congress's repeal of § 1124(3) was an "extreme remedy" for the *New Valley* issue but that legislative history demonstrates "Congress intended to do away with the

concept that a creditor receiving payment in full is unimpaired").[15]

The Bankruptcy Court here rejected such a broad reading of the 1994 repeal, concluding, "[M]y reading of the legislative history indicates that Congress merely intended to eliminate the anomalous result created by the *New Valley* decision. Thus, I conclude that Congress did not intend to eliminate unimpairment for purely money claims. It intended that to be unimpaired, the claim must receive postpetition interest." *PPI Enters.*, 228 B.R. at 352 (citation omitted); *see also In re Rocha*, 179 B.R. 305, 307 n.1 (Bankr. M.D. Fla. 1995) ("[A] solvent debtor must now pay post-petition and pre-confirmation interest on a claim to have a class considered 'unimpaired.' Section 1124(3) has been deleted in its entirety, which had previously allowed a class of creditors to be considered 'unimpaired' without paying interest on the claim."). The Bankruptcy Court also held that §§ 1124(1) and 1124(3) offered different tests for nonimpairment: "Section 1124(3) created nonimpairment status by a cash payment equal to the allowed amount of the claim but without postpetition interest. Such treatment could not qualify for nonimpairment under § 1124(1) because the failure to pay postpetition interest does not leave unaltered the contractual or legal rights of the claim." *PPI Enters.*, 228 B.R. at 352.

In other words, § 1124(1) and § 1124(3) were different exceptions to the presumption of impairment, and the repeal of one should not affect the other. We agree with the Bankruptcy Court's analysis. Contrary to Solow's representations, the legislative history does not reflect a sweeping intent by Congress to give impaired status to creditors more freely outside the postpetition interest context. Instead, as the Bankruptcy Court noted, the legislative history accompanying the repeal of § 1124(3) indicated the "principal change" in the repeal "relates to the award of post petition interest." The congressional committee specifically referenced the *New Valley* decision

---

15. The *Atlanta-Stewart Partners* and *Seasons Apartments* courts did not discuss the plain language of § 1124, at issue here, focusing instead almost exclusively on the statute's legislative history.

without referencing the text of § 1124(1) or the many cases addressing its provisions, including *Solar King*. Therefore, the legislative history supports our holding.

## IV.

Having determined Solow's claim is not impaired, we must consider the operation of § 502(b)(6). As the Bankruptcy Court noted, PPIE asserts that Solow's claim under § 502(b)(6) entitles him to $100,612.07. Solow counters that capping his claim still would award him $863,937.67. These disparate views are due to conflicting interpretations of § 502(b)(6).

## A.

Section 502(b)(6) caps a landlord's claim in bankruptcy for damages resulting from the termination of a real property lease.[16] Under § 502(b)(6), a landlord-creditor is entitled to rent reserved from the greater of (1) one lease year or (2) fifteen percent, not to exceed three years, of the remaining lease term. The cap operates from the earlier of the petition filing date or "the date on which [the] lessor repossessed or the lessee surrendered, the leased property." The landlord also retains a claim for any unpaid rent due

---

16. Section 502(b)(6) provides:

> [I]f an objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim . . . and shall allow such claim in such amount, except to the extent that if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds —
>
> (A) the rent reserved by such lease, without acceleration, for the greater of one year, or fifteen percent, not to exceed three years, of the remaining term of such lease, following the earlier of —
> (i) the date of the filing of the petition; and
> (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
>
> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

11 U.S.C. § 502(b)(6).

under such lease prior to the earlier of those dates. This language reflects Congress's intent to limit lease termination claims to prevent landlords from receiving a windfall over other creditors. *See* H.R. Rep. No. 95-595, at 353 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6309 ("[The cap] limits the damages allowable to a landlord of the debtor. . . . It is designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate. The damages a landlord may assert from termination of a lease are limited . . . ."); 4 *Collier on Bankruptcy*, § 502.03 at 7a ("[The cap is] designed to compensate the landlord for his loss while not permitting a claim so large as to prevent other general unsecured creditors from recovering a dividend from the estate.").[17]

Just over two years into the parties' ten-year lease, PPIE breached the leasehold agreement by failing to pay rent. Solow gave PPIE ten days to cure its breach. When PPIE did not respond, Solow initiated termination proceedings and filed suit seeking damages for the term of the lease. Since Solow terminated the lease long before PPIE filed its bankruptcy petition, the Bankruptcy Court correctly fixed the date on which Solow accepted PPIE's surrender of the leased property as the starting point for its § 502(b)(6) calculation.[18]

---

17. The landlord retains a duty to mitigate the tenant's breach, but any mitigation of damages secured by reletting the premises will offset only the landlord's overall potential recovery, and does not affect the § 502(b)(6) cap. The "overwhelming majority of courts" have held that the § 502(b)(6) statutory cap is not reduced by any amount a landlord has received by reletting the leased premises and mitigating its damages. *5th Ave. Jewelers*, 203 B.R. at 381; *see also In re Atl. Container Corp.*, 133 B.R. 980, 990 (Bankr. N.D. Ill. 1991).

18. In determining the final § 502(b)(6) calculation, the Bankruptcy Court should make a finding of fact as to the exact date of Solow's termination or PPIE's formal surrender of the leasehold agreement, and start the calculation from that point.

**B.**

Once the § 502(b)(6) calculation is complete, the prevailing view, and the view adopted by the Bankruptcy Court here, favors deduction of a security deposit from the § 502(b)(6) cap of a landlord's claim. *E.g.*, *Atl. Container*, 133 B.R. at 988 ("[It is] well-settled that a security deposit held by a lessor on a rejected lease must be applied against the maximum claim for lease termination damages allowed to the lessor under § 502(b)(6)."). Equating a letter of credit with a security deposit, the Bankruptcy Court held that "because Solow drew down the letter of credit for $650,000 subsequent to termination of the lease, Solow's § 502(b)(6) claim should be reduced by that amount."[19] *PPI Enters.*, 228 B.R. at 350.

The Bankruptcy Court relied upon *Oldden v. Tonto Realty Corp.*, 143 F.2d 916, 921 (2d Cir. 1944), which established the pre-Code practice of deducting security deposits from § 502(b)(6) calculations. *See also* H.R. Rep. No. 95-595, at 354 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6310 ("[A landlord] will not be permitted to offset his actual damages against his security deposit and then claim for the balance under [§ 502(b)(6)]. Rather, his security deposit will be applied in satisfaction of the claim that is allowed under [the statute]."). *Oldden* stands for the proposition that a bankruptcy filing limits damages for breach of a leasehold agreement and requires a return of the tenant's security deposit. 143 F.2d at 921. Nonetheless, it bears noting that *Oldden* involved a security deposit given directly to the creditor from the debtor, not from a third party. We must consider whether this factor requires different treatment under § 502(b)(6).

Solow contends § 502(b)(6) applies only to funds collected by the landlord directly from the tenant, and that any other funds recovered by a landlord, whether from a letter of

---

19. Solow also contends that even if he had a security deposit, and not a letter of credit, the Bankruptcy Court's application of the security deposit rule was erroneous because he drew down the letter of credit's proceeds before the Chapter 11 filing. But the § 502(b)(6) cap starts to operate on the date on which the lessee surrendered the leased property, and the Bankruptcy Court correctly rejected Solow's argument.

credit or a new tenant, are immaterial. *Accord Atl. Container*, 133 B.R. at 990 (post-petition rent, use, and occupancy payments "should not be applied against the Landlord's maximum allowable lease termination claim"); *see also In re Conston Corp.*, 130 B.R. 449, 453-54 (Bankr. E.D. Pa. 1991). In this context, Solow suggests a security deposit and a letter of credit are fundamentally different. Solow argues he never had the functional equivalent of a security deposit and instead simply maintained contractual rights to the letter of credit's proceeds, which should not affect his recovery under § 502(b)(6).

This distinction is important because if Sanwa Bank had defaulted on its letter of credit to Solow, Solow would have pursued a separate legal action against Sanwa Bank; he would have no claim against PPIE based on the letter of credit. Because the letter of credit allegedly is independent of his claim against PPIE, Solow contends the $650,000 should not be deducted from the § 502(b)(6) cap calculation.

Under similar circumstances, some courts have adopted the "independence principle" to separate proceeds from a letter of credit from the debtor's estate. *E.g.*, *Kellogg v. Blue Quail Energy Inc.*, 831 F.2d 586, 589-90 (5th Cir. 1987) (holding that "the independence principle [is] the cornerstone of letter of credit law"); *Musika v. Arbutus Shopping Ctr., L.P.*, 257 B.R. 770, 772 (Bankr. D. Md. 2001) (determining the § 502(b)(6) cap without regard to the letter of credit); *see also* 5 *Collier on Bankruptcy*, § 549.04[1] ("Property of the estate does not include the proceeds of a letter of credit paid to a creditor of the debtor who is a beneficiary of the letter."); Geoffrey L. Berman et al, *Last in Line: Landlords Use Letters of Credit to Bypass the Claim Cap of § 502(b)(6)*, 20 Am. Bankr. Inst. J. 16 (Dec. 2001). Under this view, the independence principle should generally govern in situations where a third-party issuer, not the tenant itself, provides the letter of credit.

Yet there is another view. PPIE argues that once the letter of credit is drawn down, Sanwa Bank, as guarantor, will pursue recovery of its $650,000 loss directly against PPIE. Under Solow's interpretation, this means Solow would keep the $650,000 and PPIE would be liable for that same

amount to Sanwa Bank. In effect, this result would be an end run around § 502(b)(6), since Solow would receive a windfall at PPIE's, and other creditors', expense, and PPIE would be liable twice for the same amount of money. The more appropriate outcome under the relevant case law and legislative history, PPIE contends, is to treat the letter of credit as a payment from PPIE to Solow, thus reducing PPIE's burden under § 502(b)(6) in bankruptcy.

Chapter 11 is intended to permit the debtor to rehabilitate itself while simultaneously protecting creditors. The parties here posit competing legal and equitable arguments that reflect the dual purposes of bankruptcy. Although there are reasons to the contrary, we are not inclined to disturb the rationale followed since *Oldden*. As the Second Circuit explained in *Oldden*:

> Although the instant case is admittedly different in that the tenant here pledged his own property to cover the possibility of default, and the rights of a third party are in no way involved, yet in both situations there is an attempt on the part of the landlord to insure performance by the tenant. The difference is purely technical. . . . [I]n one case the insurance is security put up by the tenant himself, while in the other it is the credit standing of a third party procured by the tenant; this difference is insufficient to justify divergent rules as to the respective allowable claims. If the total damages are limited in the one instance, they should likewise be limited in the other instance.

143 F.2d at 921.

Nonetheless, we need not decide the underlying question because it is clear the parties intended the letter of credit to operate as a security deposit. Article 33A of the parties' lease required PPIE to give Solow a security deposit in the amount of $650,000. Article 50 of the rider attached to the lease clarified PPIE's obligation:

50. *Cash Security: Letter of Credit*

A. In lieu of the cash security provided for in Article 33A, Tenant may deliver to Landlord, as security pursuant to Article 33A, an irrevocable, clean,

commercial letter of credit in the amount of $650,000 issued by a bank . . . , which shall permit Landlord (a) to draw thereon up to the full amount of the credit evidenced thereby in the event of any default by Tenant . . . or (b) to draw the full amount thereof to be held as cash security pursuant to Article 33A hereof if for any reason the Letter is not renewed . . . .

B. If Landlord shall use or apply any of the cash security deposited pursuant to Article 33A or any of the cash drawn by Landlord under the Letter of Credit . . . , Tenant shall, promptly on Landlord's demand therefor, deposit with Landlord the amount of cash required to restore the cash security deposited with Landlord to the level specified in Article 33A or in lieu thereof, shall deliver to Landlord a Letter of Credit in the amount and complying with the requirements specified in Part A above.

Interpreting this language, we find the parties intended the letter of credit to serve as a security deposit. Entitled "Cash Security: Letter of Credit," the rider expressly provided the letter of credit was "in lieu" of PPIE's cash security obligation in the leasehold agreement. The rider also provided that PPIE would be liable to Solow for replenishment of the security if he was forced to draw upon the letter of credit. We will affirm the Bankruptcy Court's treatment of the letter of credit under § 502(b)(6).

## V.

Finally, we consider whether PPIE's Chapter 11 bankruptcy filing met certain legal prerequisites. Under § 1112(b), bankruptcy courts may dismiss Chapter 11 filings for "cause" if a petition is filed in "bad faith." The Bankruptcy Court denied Solow's motion to dismiss for alleged bad faith[20] and his objection to the confirmation of

---

20. Solow characterized the filing as:

> involv[ing] a struggle between [Solow] and the [Polly Peck] Administrators in their many guises . . . over the right to [PPIE]'s remaining asset, the Del Monte stock. Recognizing that Mr. Solow was gaining the upper hand in that struggle, the Administrators retreated to this Court solely to frustrate and delay Mr. Solow's collection efforts. But such a case involving a debtor with no ongoing business, a single asset and only a few real creditors warrants dismissal.

PPIE's plan under § 1129(a)(3).[21] At issue is whether this bankruptcy filing contravened the purposes of the Bankruptcy Code under its good faith requirements. The debtor bears the burden of establishing good faith. *In re SGL Carbon Corp.*, 200 F.3d 154, 162 n.10 (3d Cir. 1999).

In *SGL Carbon*, we recognized that "no list is exhaustive of all the factors which could be relevant when analyzing a particular debtor's good faith." 200 F.3d at 166 & n.10 (internal quotations omitted). We directed courts to consider the totality of the circumstances in assessing the good faith of a Chapter 11 petition. *Id.* at 165. Although *SGL Carbon* was decided a year after the Bankruptcy Court's decision, the Bankruptcy Court properly assumed an implicit good-faith requirement for Chapter 11 filings. *PPI Enters.*, 228 B.R. at 344-45; *accord SGL Carbon*, 200 F.3d at 162. As noted, the Bankruptcy Court conducted four days of evidentiary hearings on this matter and made factual findings.[22] We review for abuse of discretion. *SGL Carbon*, 200 F.3d at 159 (abuse exists upon clearly erroneous finding of fact, errant legal conclusions, or improper application of fact to law). "An abuse of discretion can occur when no reasonable person would adopt the . . . [lower] court's view." *Rode v. Dellarciprete*, 892 F.2d 1177, 1182 (3d Cir. 1990).

The Bankruptcy Court determined it was not necessarily "bad faith" for debtors to file for bankruptcy to avail themselves of certain Code provisions. *PPI Enters.*, 228 B.R. at 345 ("[I]n evaluating a debtor's good faith, the court's only inquiry is to determine whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose for which it was not intended."); *see, e.g., In re W&L Assocs.,*

---

21. That section requires a plan be proposed "in good faith and not by any means forbidden by law."

22. Although the Bankruptcy Court may not have applied the test in a formulaic way, the Court evaluated the relevant factors before reaching its judgment. The Court mirrored our *SGL Carbon* analysis in noting that "courts have not identified with any consistency which circumstances of the debtor's filing are indicia of good faith." *PPI Enters.*, 228 B.R. at 344; *see also* Lawrence Ponoroff & F. Stephen Knippenberg, *The Implied Good Faith Filing Requirement*, 85 NW. U. L. Rev. 919, 944 (1991).

*Inc.*, 71 B.R. 962, 967-68 (Bankr. E.D. Pa. 1987) (§ 365); *In re Bofill*, 25 B.R. 550, 552 (Bankr. E.D.N.Y. 1982) (rejection of contract). The Bankruptcy Court found "the primary purpose of the petition was to cap Solow's claim pursuant to § 502(b)(6)." *PPI Enters.*, 228 B.R. at 343. "Because PPI[E]'s intention to cap Solow's claim using § 502(b)(6) [was] not a use of the Code for a purpose for which it was not intended — indeed, PPI[E] [was] using § 502(b)(6) for exactly its intended purpose — . . . PPI[E]'s filing does not violate the good faith filing doctrine." *Id.* at 345 (internal quotations omitted).[23] The Bankruptcy Court also noted that PPIE filed its Chapter 11 petition in an attempt to divide its assets during the dissolution of its parent company. The Court found this an appropriate use of Chapter 11 since the Code clearly contemplates liquidating plans under 11 U.S.C. § 1123(b)(4), whereby a debtor may develop a Chapter 11 plan to sell off all of its assets.

A good faith determination must be a fact-intensive, case-by-case inquiry. Here, the Bankruptcy Court analyzed the purpose of § 502(b)(6) and the totality of the circumstances, and determined that PPIE's bankruptcy filing did not contravene the good faith requirement. Under the circumstances, we see no abuse of discretion.

## VI.

For the foregoing reasons, we will affirm the District Court.

---

23. Moreover, as the Bankruptcy Court noted, Chapter 11 does not require reorganization, and even if PPIE had filed for Chapter 7 protection, it still would have been able to benefit from § 502(b)(6). *PPI Enters.*, 228 B.R. at 347 ("[Section] 502(b)(6) is not tethered to Chapter 11 cases. It applies equally to Chapter 7 cases."); 4 *Collier on Bankruptcy*, § 502.03, at 7a ("Under section 502(b)(6), whether the landlord's claim arises in the course of a liquidation of a debtor or whether it arises in connection with debtor reorganization under chapter 11, a single standard applies.").

23

A True Copy:
　　Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*