**In re STONEBRIDGE TECHNOLOGIES, INC., Debtor.**

**Dennis Faulkner, in his capacity as Trustee of the SBTI Liquidating Trust, Plaintiff,**

**v.**

**EOP–Colonnade of Dallas, LP, Defendant.**

**Bankruptcy No. 01–37474–HDH–11. Adversary No. 02–3187.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

April 4, 2003.

David W. Elmquist, Winstead, Sechrest & Minick, P.C., Dallas, TX, for Plaintiff.

Howard C. Rubin, Kessler & Collins, P.C., Dallas, TX, for Defendant.

### *AMENDED MEMORANDUM OPINION*

HARLIN D. HALE, Bankruptcy Judge.

This memorandum opinion addresses a narrow issue of law: whether the letter of credit in this case is a security deposit subject to the lease rejection damages cap of 11 U.S.C. § 502(b)(6) or whether the letter of credit represents only a third-party obligation to the landlord, to which the damage limitation does not apply. For the reasons stated below, the Court finds that the letter of credit at issue in this dispute is part of the security deposit and subject to the § 502(b)(6) damages cap.

### Background

Debtor Stonebridge Technologies, Inc. ("Stonebridge") and EOP–Colonnade of Dallas, LP ("EOP") were parties to a lease wherein Stonebridge leased office space in the Colonnade Tower III office building in North Dallas (the "Lease"). Pursuant to the Lease, Stonebridge was required to provide a security deposit to EOP. The security deposit ("Security Deposit") was defined in the Lease as follows:

> "Security Deposit": $105,298.85 in cash and a letter of credit in the amount of $1,430,065.74 which sum shall be reduced pursuant to the terms and conditions set forth in Section VI.B. of this Lease and eventually eliminated pursuant to the terms and conditions set forth in Section VI.C. of this Lease.

(Ex. 1 at 1.)

The Lease further provides, in relevant part, as follows:

VI. Security Deposit

    A. The Security Deposit shall be . . . held by Landlord . . . as security for the performance of [Stonebridge's] obligations. The Security Deposit is not an advance payment of Rent or a measure of Tenant's liability for damages. *Landlord may, from time to time, without prejudice to any other remedy, use all or a portion of the Security Deposit to satisfy past due Rent or to cure any uncured default by Tenant.* If Landlord uses the Security Deposit, Tenant shall on demand restore the Security Deposit to its original amount. Landlord shall return any unapplied portion of the Security Deposit to Tenant within 45 days after the later to occur of: (1) the determination of Tenant's Pro Rata Share of any Tax Excess and Expense Excess for the final year of the terms; (2) the date Tenant surrenders possession of the Premises to Landlord in accordance with this Lease; or (3) the Termination Date.

    B. A portion of the Security Deposit may be in the form of an irrevocable letter of credit (the "Letter of Credit").

\* \* \*

XIX. Events of Default

Tenant shall be considered to be in default of this Lease upon the occurrence of any of the following events of default:

    A. Tenant's failure to pay when due all or any portion of the Rent, if the failure continues for 5 days after written notice to Tenant ("Monetary Default").

    B. Tenant's failure (other than Monetary Default) to comply with any term, provision or covenant of this Lease, if the failure is not cured within 20 days after written notice to Tenant.

    C. Tenant or any Guarantor becomes insolvent, makes a transfer in fraud of creditors or makes an assignment for the benefit of creditors, or admits in writing its inability to pay its debts when due.

(Ex. 1 at 7–8, 14–15) (emphasis added.)

Stonebridge tendered the cash and letter of credit required by the Lease as Security Deposit to EOP. The letter of credit was an Irrevocable Stand-by Letter of Credit issued by the Bank of Oklahoma (the "Bank") in favor of EOP (the "Letter of Credit").

Stonebridge executed a promissory note to the Bank to secure the Bank against a draw on the Letter of Credit. The promissory note, in turn, was secured, in part, by a $1,250,000.00 certificate of deposit (the "CD") at the Bank.

Pursuant to the terms of the Letter of Credit, $1,430,065.74 was available for payment at sight by a draft drawn by EOP on the Bank when accompanied by the following documents:

A. The original of the Irrevocable Stand-by Letter of Credit;

B. The beneficiary's (EOP's) dated statement purportedly signed by one of its officers reading:

This draw in the amount of $_____ U.S. Dollars ($_____) under your Irrevocable Stand-by Letter of Credit No. BOK00SDF07102 represents funds due and owing to us as a result of the applicant's failure to comply with one or more terms of that certain Lease by and between EOP–Colonnade of Dallas Limited Partnership, a Delaware limited partnership, as Landlord, and Stonebridge Technologies, an _____, as Tenant beyond notice and cure periods as set forth in Section XIX of the Lease.

About one year into the lease term, Stonebridge filed a Petition for Relief under Chapter 11 of the United States Bankruptcy Code and eventually confirmed a plan of liquidation. At the time of the bankruptcy filing, Stonebridge owed EOP rent and other charges, including tenant improvement overages, electric bills and invoices from work orders performed by EOP, totaling $71,895.61, plus rent for September 2001 totaling $105,298.85. Neither Stonebridge nor EOP offered any evidence that EOP provided any written notice to Stonebridge prior to the filing date of the bankruptcy petition, thereby triggering the time period necessary to find an Event of Default under the Lease.

Following the bankruptcy filing, in September 2001, Stonebridge negotiated with EOP to reduce the amount of leased space and to reduce the lease obligations, including post-petition expenses. Stonebridge paid EOP a total of $50,000 which was applied to the September, 2001, post-petition rent due under the Lease.

Stonebridge filed a Motion to Sell Assets ("Motion to Sell") to Stonebridge Acquisition, Inc. ("SAI"), a corporation that was formed by insiders of Stonebridge to acquire the assets of Debtor. EOP filed a Motion for Payment of Rent Pursuant to 11 U.S.C. § 365(d)(3), and asked the court to order Stonebridge to pay the unpaid balance of the September 2001 rent of $37,749.50, plus late fees, and October rent of $105,888.40, plus late fees. A hearing on this motion was set in late October 2001, on the same day as the hearing on Debtor's Motion to Sell.

At that hearing, EOP and Stonebridge announced in open court an agreement that the Lease would be rejected effective no earlier than October 1, 2001 and no later than October 23, 2001, depending on the parties' success in finalizing a new short-term lease. The short-term lease was to be assumed by Stonebridge and assigned to SAI. The Court did not enter an order rejecting the Lease at the hearing. Instead, a hearing was set in early November 2001, at which the Court was to determine whether to approve the agreement to reject the Lease and if so, the effective date of the lease rejection if no new short-term lease had been consummated.

As part of the agreement reached in accordance with the rejection of the Lease, EOP was allowed an administrative rent claim in the amount of $42,137.50 and the

parties agreed that pre-petition rent due for September was $17,549.81. At the hearing, the Court also approved Debtor's Motion to Sell.

One day before the October hearing, EOP initiated a draw request via overnight delivery to the Bank under the Letter of Credit in the amount of $1,430,065.74. However, no agreement existed between the parties on that day that the Lease would be rejected retroactively to October 1, 2001.

In its draw request to the Bank, EOP represented the following:

> THIS DRAW REQUEST IN THE AMOUNT OF ONE MILLION FOUR HUNDRED THIRTY THOUSAND SIXTY–FIVE AND 74/100 U.S. DOLLARS (1,430,065.74) UNDER YOUR IRREVOCABLE STANDBY LETTER OF CREDIT NO. BOK00SDF07102 REPRESENTS FUNDS DUE AND OWING TO U.S. AS A RESULT OF THE APPLICANT'S FAILURE TO COMPLY WITH ONE OR MORE OF THE TERMS OF THAT CERTAIN LEASE BY AND BETWEEN EOP–COLONNADE OF DALLAS LIMITED PARTNERSHIP, A DELAWARE LIMITED PARTNERSHIP, AS LANDLORD, AND STONEBRIDGE TECHNOLOGIES, A DELAWARE CORPORATION, AS TENANT BEYOND NOTICE AND CURE PERIODS AS SET FORTH IN SECTION XIX OF THE LEASE.

The draw request was received by the Bank on October 23, 2001. The next day, on October 24, 2001, the Bank notified EOP that the documents submitted by EOP did not meet the strict requirements of the Letter of Credit, and refused to honor it. Specifically, the draw request was not made on EOP's letterhead or signed by an officer of EOP. Thereafter, on October 24th, EOP delivered another draw request to the Bank, still dated October 22, 2001, that corrected the deficiencies. This request was received by the Bank on October 25, 2001 and the Bank considered the draw request effective as of that date.

On October 30, 2001, the Bank honored EOP's draw request, issued an expense check in the amount of $1,430,065.74 and delivered it to EOP. In addition, as of trial, EOP also held the $105,298.85 representing the cash portion of the Security Deposit.

On November 7, 2001, a new short-term lease was executed by EOP and Stonebridge. On November 8, 2001, the Court entered an Agreed Order Approving Rejection of Lease and Allowing Claim of EOP–Colonnade of Dallas Limited Partnership for Rent Pursuant to 11 U.S.C. § 365(d)(3) (the "Agreed Order"). Pursuant to the terms of the Agreed Order, the Lease was deemed rejected as of October 1, 2001.

As of the effective rejection date, EOP's statutory damages were capped at $1,353,031.02, representing one year's rent reserved by the Lease from the date of the filing of the petition and unpaid rent due under the Lease, without acceleration.

Plaintiff Dennis Faulkner, the Trustee of the SBTI Liquidating Trust, the entity charged with liquidating the Debtor's remaining assets, subsequently filed this adversary proceeding against EOP. The Trustee has the legal capacity to sue and recover on the claims presented.

Plaintiff alleges that EOP breached the Lease by its untimely and/or improper draw on the full amount of the Letter of Credit in addition to EOP's retention of the cash portion of the Security Deposit. Plaintiff alleges that § 502(b)(6) applies to cap EOP's damages for the rejection of the Lease in an amount that is less than the

total Security Deposit remitted, i.e. the cash plus the full amount of the Letter of Credit. Thus, Plaintiff alleges, EOP has wrongfully retained a portion of Stonebridge's Security Deposit in violation of the terms of the Lease.

### Analysis of the Cap

Section 502(b)(6) of the Bankruptcy Code mandates that a lessor's claim for damages for termination of an unexpired lease is subject to a statutory cap. Section 502(b)(6) provides that

the claim of a lessor for damages resulting from the termination of a lease of real property is limited to the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease plus any unpaid rent due under such lease without acceleration.

11 U.S.C. § 502(b)(6).

The capped damages are therefore calculated by taking the greater of 1) the rent reserved by the lease for one year or 2) 15% of the remaining rent under the lease, but not to exceed the rent reserved by the lease for three years, and then adding any unpaid rent to that amount. The cap clearly applies to the lease obligations of the debtor as tenant or lessee under the lease. Courts have also applied the cap to lease termination damages when the debtor is a guarantor of the lease and not a tenant. *See, e.g., In re Farley, Inc.,* 146 B.R. 739 (Bankr.N.D.Ill.1992).

■ Section 502(b)(6) evidences Congress' intent to "compensate the landlord for his loss while not permitting a claim so large as to prevent other general unsecured creditors from recovering a dividend from the estate." *In re Handy Andy Home Improvement Ctrs., Inc.,* 222 B.R. 571, 574 (Bankr.N.D.Ill.1998) (citing *Collier on Bankruptcy* § 502.03 at 7a (15th

ed.1998)). Once the value of the § 502(b)(6) damages are calculated, certain amounts must be deducted from the capped damages to determine the final amount the landlord is due.

### Application of the Cap to Security Deposits

■ The application of § 502(b)(6) to a security deposit has been considered by many courts. Upon rejection of the lease and once the value of the § 502(b)(6) capped damages are determined, any security deposit held by the landlord must be applied against the landlord's capped damages claim. As a general rule, as long as the landlord applies the security deposit subsequent to the date of the tenant's bankruptcy filing, § 502(b)(6) will require the security deposit be subtracted from the landlord's § 502(b)(6) claim. *In re PPI Enterprises (U.S.), Inc.,* 228 B.R. 339, 350 (Bankr.D.Del.1998), *aff'd,* 324 F.3d 197 (3rd Cir.2003); *In re Handy Andy Home Improvement Ctrs., Inc.,* 222 B.R. 571, 574 (Bankr.N.D.Ill.1998); *In re Atlantic Container Corp.,* 133 B.R. 980, 988 (Bankr. N.D.Ill.1991).

■ In reaching the conclusion that the cap applies to security deposits most courts rely upon the legislative history of the statute. For example, in *Handy Andy Home Improvement,* the court noted

[s]ection 502(b)(6) is ambiguous, as it contains no reference to the treatment of security deposits. Where, as here, the statute does not address the set-off issue, so that the statutory language contains an ambiguity on its face, legislative history may be considered. *See generally United States v. Kinsley,* 518 F.2d 665, 669 (8th Cir.1975). The House and Senate Reports state that the landlord "will not be permitted to offset his actual damages against his security deposit and then claim for the balance

under [Section 502(6)(b)]. Rather, his security deposit will be applied in satisfaction of the claim that is allowed under this paragraph." H.R. REP. No. 595 (1977) and S. REP. No. 989 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 5787. In re Handy Andy Home Improvement Ctrs., Inc., 222 B.R. at 574. Thus, in applying the § 502(b)(6) statutory cap, a bankruptcy court must be mindful of the intent of Congress to compensate the landlord fairly but not to swamp the estate with such a large claim as to preclude the other unsecured creditors from a dividend.

### Letters of Credit

In general, letters of credit involve three separate and distinct contracts: 1) the underlying contract between the customer and the beneficiary, i.e. a lease; 2) the customer's contract with the issuing bank; and 3) the issuing bank's contract to pay the beneficiary. In re Originala Petroleum Corp., 39 B.R. 1003, 1014–15 (Bankr. N.D.Tex.1984).

EOP argues that the Letter of Credit is not a security deposit for § 502(b)(6) purposes since it is not an advance of money by Stonebridge, but instead an independent obligation of the Bank of Oklahoma to pay sums as long as certain representations were made to the Bank by EOP. EOP argues that since the Letter of Credit is an obligation of the Bank and not Debtor Stonebridge's obligation, the Letter of Credit is not property of the estate and subject to the § 502(b)(6) cap on damages.

There appears to be little authority addressing the relationship of § 502(b)(6) to a letter of credit. Plaintiff points this Court to one court which has ruled that a

letter of credit held as security deposit must be applied to payment of the landlord's claim, as capped by § 502(b)(6). In re PPI Enterprises (U.S.), Inc., 228 B.R. 339, 350 (Bankr.D.Del.1998), aff'd, 324 F.3d 197 (3rd Cir.2003). The bankruptcy court's opinion in PPI Enterprises does not answer the question at bar, however. The PPI Enterprises bankruptcy court did not, in its opinion, consider whether the letter of credit inherently constituted a security deposit for purposes of § 502(b)(6). Instead, the court addressed whether a pre-petition, post-termination-of-the-lease draw on a letter of credit constituted property of the estate subject to the cap. It appears that the PPI Enterprises court assumed that a post-petition draw on the letter of credit would be subject to the statutory cap. Thus, the contested issue in PPI Enterprises was whether the timing of the draw made it a security deposit subject to § 502(b)(6), not the letter of credit's nature as a security deposit.

Very recently, on appeal, the Third Circuit Court of Appeals did address whether the PPI Enterprises letter of credit constituted a security deposit. Solow v. PPI Enterprises (U.S.), Inc. (In re PPI Enterprises (U.S.), Inc.), 324 F.3d 197 (3rd Cir. 2003). The Court found that because the lease defined security deposit as "[i]n lieu of ... cash security ... Tenant may deliver to Landlord, as security ..., an irrevocable, clean, commercial letter of credit" and provided that the tenant would replenish the letter of credit with cash security in the event of a draw on the letter of credit, the letter of credit constituted a security deposit and was subject to the § 502(b)(6) cap.[1]

---

1. The instant case is slightly different in that the parties expressly contracted that the Letter of Credit would be part of the Security Deposit. Some commentators have argued that the cap should not apply in a PPI Enterprises type situation, when the letter of credit is "in lieu of" the cash security deposit. See Kimberly S. Winick, Tenant Letter of Credit;

EOP's position is that a letter of credit can never constitute a security deposit under § 502(b)(6).[2] EOP argues that because the Letter of Credit is an obligation of the Bank, and not of Debtor, it is independent of the Lease and therefore not subject to § 502(b)(6).

### The Independence Principle

■ The law in this Circuit is clear that letters of credit and the proceeds therefrom are not property of the debtor's estate. *Kellogg v. Blue Quail Energy, Inc. (Matter of Compton Corp.)*, 831 F.2d 586, 589 (5th Cir.1987); *In re Originala Petroleum Corp.*, 39 B.R. 1003, 1014–15 (Bankr. N.D.Tex.1984). This is because letters of credit are generally subject to the "independence principle."

> Under the independence principle, an issuer's obligation to the letter of credit's beneficiary is independent from any obligation between the beneficiary and the issuer's customer. All a beneficiary has to do to receive payment under a letter of credit is to show that it has performed all the duties required by the letter of credit. Any disputes between the beneficiary and the customer do not affect the issuer's obligation to the beneficiary to pay under the letter of credit.

*Kellogg*, 831 F.2d at 590.

■ However, the dispute here does not turn on whether the Bank should have paid under the Letter of Credit, i.e. whether the funds should have been distributed. The independence principle

protects only the *distribution* of the proceeds of the letter of credit. It prohibits an attack on the issuing bank's distribution to the beneficiary and does not address claims respecting the underlying contract.

\* \* \*

It is one thing to attempt to prevent the distribution of the proceeds of a letter of credit, an attempt the doctrine of independence is designed to prevent; but it is quite another to bring an action on the underlying contract that created the letter of credit.

*Demczyk v. Mutual Life Ins. Co. of New York (In re Graham Square, Inc.)*, 126 F.3d 823, 827 (6th Cir.1997).

The dispute in the present case turns, instead, on how to construe the Letter of Credit and then how the proceeds of the Letter of Credit should have been applied under the Lease, as may be limited by the Bankruptcy Code. In other words, once EOP received the proceeds of the Letter of Credit, was it entitled to retain the entirety of those funds unfettered by the terms of the Lease pursuant to the independence principle, or was it constrained to retain only amounts equaling its damages after application of the damages cap provided by § 502(b)(6)?

This Court holds that although the independence principle prohibits any party, under most circumstances, from contesting EOP's actual withdrawal of funds under

*Bankruptcy Issues for Landlords and Their Lenders*, 9 Am. Bankr.Ins. L.Rev. 733, 752 (2001).

**2.** EOP argues that letters of credit are akin to guaranty agreements. In a well-reasoned opinion, another jurist in this District has discussed the fundamental differences between letters of credit and guaranties. *See Berliner Handels–Und Frankfurter Bank v. East Texas Steel Facilities, Inc. (In re East Texas Steel Facilities, Inc.)*, 117 B.R. 235, 241(Bankr.N.D.Tex.1990) (Abramson, J.). *But see Musika v. Arbutus Shopping Center Ltd. Pship.(In re Farm Fresh Supermarkets of Md., Inc.)*, 257 B.R. 770 (Bankr.D.Md.2001) (letters of credit are akin to guaranties). The Court does not determine whether letters of credit are akin to guaranties since such an analysis is not necessary to this case.

the Letter of Credit, under these facts, the Letter of Credit was expressly part of the Security Deposit. Thus, the proceeds of the Letter of Credit became a part of the Security Deposit pursuant to the express terms of the Lease. Accordingly, the Lease and intervening bankruptcy law control EOP's entitlement to the funds and what it can then do with those proceeds. If the Lease, and intervening bankruptcy law, mandate that the funds be limited and applied in a certain manner and those funds are not so applied, then EOP demanded and received too much and is therefore, in breach of the Lease.

### Can a Letter of Credit Be a Security Deposit?

■ Black's Law Dictionary defines security deposit as "[m]oney placed with a person as earnest money or security for the performance of a contract." BLACK'S LAW DICTIONARY 450 (7th ed.1999). In relation to the Bankruptcy Code, neither § 502(b)(6) nor the comments thereafter provide a definition of "security deposit." Thus, the Court looks to the parties' definition of security deposit. The parties unequivocally agreed that the Letter of Credit constituted "a portion of the Security Deposit."

In this case, the Lease expressly defines Security Deposit to include the Letter of Credit. The Letter of Credit, under these facts, constitutes a part of the Security Deposit for purposes of § 502(b)(6). Although initially independent of the Lease, the proceeds of the Letter of Credit must be applied as the parties bargained for—as a security deposit for the Lease. *See also Solow v. PPI Enterprises (U.S.), Inc. (In*

*re PPI Enterprises (U.S.), Inc.)*, 324 F.3d 197 (3rd Cir.2003).

The Bankruptcy Code and, in particular, § 502(b)(6) modify and govern the provisions of the Lease and mandate that the Security Deposit be applied to the capped damages. EOP breached the Lease by initiating a draw request for the full amount of the Letter of Credit on October 22, 2002, prior to any Event of Default, as defined by the Lease, or any valid rejection of the lease pursuant to § 365 of the Bankruptcy Code,[3] and then ultimately wrongfully retaining the excess over and above the § 502(b)(6) damages cap. *See also Papio Keno Club, Inc. v. City of Papillion (In re Papio Keno Club, Inc.)*, 262 F.3d 725, 731 (8th Cir.2001) (funds drawn on letter of credit and held in excess of actual damages must be returned). EOP expressly agreed to return any unapplied portion of the Security Deposit. EOP failed to do so.

EOP points to a recent bankruptcy court decision from Maryland to support its position. In *Musika v. Arbutus Shopping Center Ltd. Pship.(In re Farm Fresh Supermarkets of Md., Inc.)*, 257 B.R. 770 (Bankr.D.Md.2001), the court held that the Chapter 7 trustee could not recover the landlord's draw on a standby letter of credit as property of the bankrupt debtor's estate. In so holding, the court found that the landlord properly notified the debtor that it was in monetary and nonmonetary default under the lease and thus, the landlord properly drew down on the letter of credit "pursuant to the terms of the lease and the letter of credit." *Id.* at 772. Accordingly, neither the letter of credit nor its proceeds were property of the debtor's

---

**3.** Rejection of an unexpired lease can only be accomplished by an order of the bankruptcy court. *See* 11 U.S.C. § 365(a); *Arizona Appetito's Stores, Inc. v. Paradise Vill. Inv. Co.*, 893 F.2d 216, 219 (9th Cir.1990). Although this

Court entered an order on November 7, 2002 that the Lease would be deemed rejected as of October 1, 2002, the deemed rejection does not rectify EOP's "preemptive" draw.

estate since the landlord was contractually entitled to them.

However, *Musika* is not a § 502(b)(6) case. *Musika* is also distinguishable on its facts from the case at bar. In the present case, EOP could only contractually apply the Security Deposit to "satisfy past due Rent or to cure any uncured default" by Stonebridge. Landlord EOP never provided notice of monetary or nonmonetary default to Stonebridge. Other than from the pre-petition rent, EOP's right to payment from the Security Deposit for its damages stems solely from § 502(b)(6) and not from the Lease itself. EOP never declared a written default under the Lease, and other than past due, pre-petition rent, it was not contractually entitled to apply the Security Deposit to its damages on the date of the draw on the Letter of Credit. Thus, EOP breached the lease by wrongfully withholding the unapplied portion of the Security Deposit, in other words any amount in excess of its § 502(b)(6) damages.

### Conclusion

For the reasons set forth herein, the Court finds the Letter of Credit in this case and its proceeds are part of the Security Deposit to which the damages cap of § 502(b)(6) applies. EOP breached the Lease by drawing down on the Letter of Credit prior to the effective rejection of the Lease and then improperly withheld amounts in excess of its § 502(b)(6) damages. This holding preserves the independence principle and also fulfills the intent of Congress regarding the rejection damages limit for landlord claims.