OPINION
SMITH, Circuit Judge.
This appeal asks us to determine whether Chapter 11 bankruptcy petitions filed by Santa Fe Minerals, Inc. and 15375 Memorial Corporation (together, the “Debtors”) were filed in good faith. There *609 is ample evidence to support the finding of the District Court that the Debtors’ bankruptcy petitions served no valid bankruptcy purpose and were used primarily as a litigation tactic to protect the Debtors and their parent companies from liability in pending litigations. Thus, we will affirm the District Court’s order dismissing the bankruptcy petitions for lack of good faith.[1]
The Debtors raise two issues in this appeal. First, they argue that the District Court incorrectly exercised plenary review, instead of review for an abuse of discretion, of the good faith inquiry. Second, they argue that the District Court erred in concluding that they did not file their bankruptcy petitions in good faith.[2]
I.
The historical and narrative facts in this case are not disputed. The District Court, finding no clear error in the Bankruptcy Court’s findings of fact, adopted those facts for the purposes of its decision, BEPCO, L.P. v. 15375 Mem’l Corp. (In re 15375 Mem’l Corp. III), 400 B.R. 420, 423 n. 4 (D.Del.2009), and we do so as well. These facts were ascertained during a three-day trial held by the Bankruptcy Court to decide several motions, including a motion by Bass Enterprises Production Co. (“BEPCO”) to dismiss the Debtors’ Chapter 11 petitions for lack of good faith. Santa Fe Minerals, Inc. v. BEPCO, L.P. (In re 15375 Mem’l Corp. I), 382 B.R. 652, 658 (Bankr.D.Del.2008).

The Parties

The parties in this case are all companies involved in oil and gas exploration. The Debtors, 15375 Memorial Corporation (“Memorial”) and Santa Fe Minerals, Inc. (“Santa Fe”), are both subsidiaries of Glo-balSantaFe Corporation (“GSF”). Id. at 660. Both subsidiaries list the address of the U.S. headquarters for GSF, 15375 Memorial Drive, Houston, Texas, as their address. Id. Neither company, however, actually has offices at that address or at any other location. Id.
Memorial is a holding company incorporated in Delaware and is the immediate parent of Santa Fe. Id. It has no employees and engages in no business other than acting as the sole shareholder of Santa Fe. Id. In June 2001, Memorial voluntarily dissolved, but that dissolution was revoked in June 2004 “under the advice of counsel[J” Id.
Santa Fe was an oil and gas exploration company incorporated in Wyoming. Id. On December 8, 2000, id. at 663, it filed for dissolution under Wyoming law, id. at 660. At that time, “Santa Fe’s assets were up-streamed to [GSF and related entities] or other of the Debtors’ affiliates[.]” Id. at 662. “Santa Fe’s dissolution [permits] it ... to act only through its sole sharehold *610 er, Memorial, in furtherance of winding up its remaining business.” Id. at 660. It “currently has no officers, directors or employees and engages in no business.” Id. Despite its December 8, 2000, dissolution, Santa Fe did not publish notice of that dissolution until August 4, 2006. Id. at 663. As a result, Santa Fe may not have been able to avail itself of the Wyoming state law statute of limitations defense for dissolved corporations until August 4, 2009. Wyo. Stat. Ann. § 17-16-1407 (providing three year statute of limitations starting from date of publication of notice of dissolution for claims against dissolved corporations).[3]
GSF is a Cayman Islands corporation that indirectly owns Memorial and Santa Fe. In re 15375 Mem’l Corp. I, 382 B.R. at 660-61. It also owns numerous other companies (collectively, including GSF, the “GSF Entities”), including Entities Holdings, Inc. (“EHI”) and GlobalSantaFe Corporate Services, Inc. (“GSFCSI”). Id. The GSF Entities, together with Memorial and Santa Fe, are “one of the world’s largest offshore oil and gas drilling contractors and a leading provider of drilling services.” Id. at 660.
EHI is a wholly owned, direct subsidiary of GSF. Id. It is the parent and sole shareholder of Memorial, id. at 660-61, and it also owns several other subsidiaries, id. at 661. EHI is a holding company and has no employees. Id.
GSFCSI is a wholly owned, indirect subsidiary of GSF. Id. It provides corporate services to Memorial, Santa Fe, and the GSF Entities. Id. GSFCSI, among other things, maintains the Debtors’ books and records. Id.
David E. Faure, the vice president and assistant secretary of Memorial, was charged with marshaling the Debtors’ as *611 sets prior to the filings of their bankruptcy petitions, dealing with the Debtors’ liabilities, and working on the Debtors’ bankruptcy cases. Id. Aside from handling these tasks, Faure held other important decision-making responsibilities at GSFCSI, EHI, and Memorial. Id. He was “employed by GSFCSI as vice president, assistant general counsel and assistant secretary.” Id. As an employee of GSFCSI, Faure provided “legal services to EHI, primarily assisting it with the defense of litigation.” Id. “[He] also serve[d] as vice president and assistant secretary of both Memorial and EHI.” M[4] In carrying out his various duties, Faure reported to and took direction from James L. McCullough, the senior vice president and general counsel of GSF. Id. Although McCullough had no formal title at Santa Fe or Memorial, Faure had to receive McCullough’s approval before he could file the Debtors’ bankruptcy petitions.[5] Faure consulted McCullough while preparing the Debtors’ bankruptcy petitions. Id. Faure also sought legal advice from McCullough regarding Memorial on matters unrelated to bankruptcy prior to filing its bankruptcy petition. Id.
As part of Faure’s effort to marshal the Debtors’ assets, he oversaw the recovery of funds from the GSF Entities for the benefit of the Debtors’ estates. Id. This included seeking recovery of funds that were “upstreamed to EHI and Memorial after Santa Fe’s dissolution.” Id. After an initial investigation, though, Faure determined that the Debtors’ potential claims against the GSF Entities were not viable. Id. Faure’s determination is unsurprising considering that he also testified that “he [did] not think [the claims against the GSF Entities] ‘[we]re very good claims.’” Id. “Faure further testified that filing a lawsuit against [GSF] on behalf of the Debtors to facilitate the return of upstreamed funds would jeopardize his job.” Id.
*612 BEPCO is a limited partnership that is, among other things, challenging the Debtors’ bankruptcy petitions for lack of good faith. Its involvement in the Debtors’ bankruptcies stems from a property of which BEPCO and Santa Fe are both in the chain of title, a 1938 mineral lease of land in Avoyelles Parish, Louisiana (the “Tebow Property”). Both companies have been accused of contaminating the Tebow Property. Id. at 663-66. On April 27, 2007, BEPCO filed proofs of claim in the Bankruptcy Court asserting a right to recover against the Debtors and the GSF Entities all obligations and damages arising out of or related to litigation concerning the Tebow Property. Id. at 666.

The Tebow Litigation

On April 18, 2005, individuals affected by the contamination of the Tebow Property (the “Tebow Plaintiffs”) filed suit in Louisiana state court naming Santa Fe, BEPCO, and others as defendants, seeking $320 million for the contamination (the “Tebow Action”). Id. at 663-64. The Te-bow Plaintiffs alleged that “water produced from oil wells [on the Tebow Property] was disposed of in unlined earthen pits on their property!;] this water contained salt and dangerous minerals, metals, and radioactive materials, and the contamination migrated both horizontally and vertically into the surrounding soil and ground water.” Id. Some of the pollutants entered and contaminated a drinking water aquifer. Id. at 663-64.
As a result of trial preparation, the Debtors learned that the Tebow Plaintiffs’ “[e]xpert [r]eports indicated that[ ] the worst contamination on the Tebow Property occurred in the East Pit area — an area located on the 1938[m]ineral [l]ease for which both BEPCO and Santa Fe were in the chain of title.” Id. at 664. They also learned from the work of their own expert and that of the Tebow Plaintiffs’ expert, that the East Pit was probably constructed after 1965 and that BEPCO assigned the 1938 mineral lease to a different company in 1964. Id. Thus, Santa Fe ascertained that BEPCO’s liability for contamination caused by the East Pit was likely to be less than companies like it, i.e., companies that used the Tebow Property after 1964. Id. In short, Santa Fe “knew that the [e]xpert [r]eports showed that it, not BEP-CO, was to blame for pollution around the East Pit.” Id. Santa Fe also learned that the contamination caused to the drinking water aquifer by the East Pit would cost approximately $189 million to clean. Id.
The Debtors were also aware that filing for bankruptcy would permit them to avoid liability in the Tebow Action. Id. at 665. The Tebow Plaintiffs’ complaint stated that “if a party ... has or intends to file for bankruptcy concerning any of the claims alleged ..., it is the express intention of Plaintiffs not to pursue those claims or party or parties in this action, even if such party or parties has been inadvertently named as a defendant.” Id.
The Tebow Action was scheduled for trial on October 11, 2006. Id. Leading up to the trial, BEPCO and Santa Fe participated in depositions, hired experts, and engaged in fact and expert discovery. Id. Santa Fe hoped that its dissolution under Wyoming law would be a defense to the Tebow Action, but it was concerned that its failure to publish notice until 2006 would undermine the defense. Id. at 667 (“[The] Debtors determined in the Summer of 2006 that the failure to give proper notice in connection with Santa Fe’s dissolution created a risk to Santa Fe’s shareholders for its liabilities in litigations, including the Tebow Action.”). In June 2006, the Tebow Plaintiffs and BEPCO informed Santa Fe that they would pursue the GSF Entities under an alter ego theo *613 ry. Id. Although the record is unclear as to when, at some point during the Tebow Action BEPCO asserted claims against Santa Fe and its insurers for the damage done to the Tebow Property. Id. at 686-92. It also asserted alter ego claims against the GSF Entities. Id.

The Demand Note

On August 8, 2006, eight days before the Debtors filed for bankruptcy, Memorial, through Faure, executed a demand note issued by EHI. Id. at 667. The demand note provided a revolving credit line of $500,000 in exchange for, among other things, Memorial (i) “accepting] all liabilities existing or arising from the activities of [Santa Fe]” and agreeing that “(ii) it is not a single business enterprise with [GSF] or any affiliate of [GSF]” and that “(iii) it will defend and indemnify [GSF] from any claims, whether based on an alter-ego, single business enterprise or other principle, relating to [Santa Fe’s] operations.” Id. at 668. A few days later, Memorial obtained $100,000 from EHI under the note to pay bankruptcy costs. Id.
Faure testified at trial that clause (i) of the demand note was intended to protect EHI and other GSF Entities from liability arising from Santa Fe’s activities, including the Tebow Action.[6] Id. Clause (ii), according to Faure, stipulated that “Memorial had no claim ... against EHI, GSF Corp. or GSF Corp.’s affiliates based on a single business enterprise theory.” Id. This clause was not objectionable to Faure because, based on his due diligence, he had concluded that “Memorial was not a single business enterprise with any of the [GSF Entities].” Id. at 669. Clause (iii) “provided for Memorial to defend and indemnify EHI from any claim related to Santa Fe’s operations, whether based on alter ego, single business enterprise or other theories.” Id. at 668. Together, the three clauses were included in the demand note “so that EHI and other [GSF Entities] would not be prejudiced in the face of assertions being made by the Tebow Plaintiffs that GSFCSI’s [designation of Faure as the Debtors’ representative in bankruptcy] and [his assistance] in the defense of the Tebow Action rendered such entities liable as a single business enterprise.” Id. at 669. The terms of the demand note were negotiated between Faure and Drew Baker, an attorney employed by GSFCSI who provided legal counsel to EHI. Id.

The Bankruptcy Filings and their Effect on the Tebow Action

On August 16, 2006, eight days after executing the demand note, the Debtors filed Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the District of Delaware. The next day, the Tebow Plaintiffs dismissed Santa Fe from the Tebow Action. Id. at 665.
On August 22, 2006, BEPCO filed a third party complaint in the Tebow Action seeking relief from the GSF Entities under an alter ego theory. Id. That complaint was dismissed without prejudice on the same day for procedural reasons. Id. On August 25, 2006, BEPCO refiled its third *614 party complaint. Id. In response, the Debtors accused BEPCO of violating the automatic stay of litigation outside the bankruptcy proceedings. Id. On October 19, 2006, BEPCO sought relief from the Bankruptcy Court’s automatic stay to file its third party complaint in Louisiana state court, and the Bankruptcy Court denied BEPCO’s request. Id. at 666.
Four months later, on February 19, 2007, BEPCO proceeded to trial in the Tebow Action and settled with the Tebow Plaintiffs before a judgment was rendered. Id. In the settlement, BEPCO agreed to pay the Tebow Plaintiffs $20 million and assist in cleaning the Tebow Property in exchange for an assignment to BEPCO of the Tebow Plaintiffs’ property damage claims. Id. On April 27, 2007, BEPCO filed a proof of claim in the Bankruptcy Court against the Debtors based on Santa Fe’s liabilities in the Tebow Action. Id. BEPCO asserted claims against Santa Fe for assignment, contribution, indemnity, and for the contamination of the Tebow Property. Id. BEPCO also asserted claims against Memorial and the GSF Entities based on Wyoming law “authorizing the recovery of distributions made at dissolution and alter ego (and other related) theories.” Id.
On February 15, 2008, the Bankruptcy Court granted BEPCO relief from the automatic stay to pursue its action against Santa Fe and Santa Fe’s insurers in Louisiana state court. Id. at 686-92. The Bankruptcy Court also held that BEPCO’s assertion of alter ego claims against Memorial and the GSF Entities did not violate the automatic stay. Id. at 692. The Bankruptcy Court did not, however, permit BEPCO to proceed with its alter ego claims in Louisiana state court at that time. Id. at 695. It left open the issue of whether Memorial and the GSF Entities could be held liable under an alter ego theory, requesting further briefing on the issue by the parties. Id. It did so in part because the Debtors insisted that any alter ego claim against the GSF Entities was property of their estates and, thus, could not be asserted by BEPCO. See id. at 677.
In sum, after the Debtors filed for bankruptcy, the Tebow Plaintiffs dismissed Santa Fe from the Tebow Action and settled with BEPCO. As part of that settlement, BEPCO was assigned the Tebow Plaintiffs’ claims for property damage. BEPCO asserted those claims against Santa Fe, Santa Fe’s insurers, Memorial, and the GSF Entities in Louisiana state court. The Bankruptcy Court granted BEPCO relief from the automatic stay for the claims against Santa Fe and its insurers, but it did not permit BEPCO to proceed with its alter ego claims against Memorial and the GSF Entities.

The Litigations Pending at the Time of the Debtors’ Bankruptcy Petitions

At the time the Debtors filed their bankruptcy petitions, they were on notice of three pending lawsuits against them: the Tebow Action, an Oklahoma state court action for property damage (the “Ellison Action”), and a California state court personal injury action (the “Harris Action”). Id. at 669-70.
The Ellison Action was filed in 2001 and principally targeted a disposal company, FPC Disposal, Inc., for damage to land caused by its “construction, operation and maintenance of a commercial disposal facility.” Id. at 669. Santa Fe was named as a defendant because it was “one of many parties who disposed of materials at the facility.” Id. “BP Amoco Corporation, a co-defendant of Santa Fe’s in the Ellison Action against which Santa Fe asserted a right of indemnity, [defended] the Ellison Action on Santa Fe’s behalf.” Id. As a *615 result, “Santa Fe incurred no material defense costs or expenses in [the case].” Id. The Ellison Action settled on February 19, 2007, and Santa Fe was released from liability without making any contribution to the settlement. Id.
The Harris Action was filed in California state court and “relat[ed] to [Memorial’s] past ownership of an allegedly contaminated site, located in Alhambra, Californiaf.]” Id. The current status of this action is unclear, but at the time the Debtors’ filed their bankruptcy petitions they had not “hired counsel or incurred material expenses” to defend the action. Id. at 670.
In addition to these three lawsuits, the Debtors had notice of three others that they believed could affect their interests. Id. Two asbestos-related lawsuits in California state court were pending against a predecessor of Memorial (the “Sinz and Troia Actions”). Id. Debtors were also concerned about a so-called oilfield legacy suit in Louisiana for which they had received a request for non-party discovery (the “Dore Action”). Id.

The Insurance Review Project

Faure and GSFCSI conducted an extensive insurance review between October 2006 and May 2007 to determine the extent of Santa Fe’s insurance coverage. Id. at 673. They discovered that the Debtors had policies that covered the claims asserted in the Tebow Action and other policies that could possibly cover the Sinz and Troia Actions. Id. at 673-74. “The [insurance [r]eview ... was undertaken for the benefit of the entire GlobalSantaFe corporate family.” Id. at 673. “The overall goal ... was to compile a database of policies that could be reviewed as claims came up against any [GSF-related entity], whether it be the Debtors or others.” Id.

The Debtors’ Assets

Aside from the insurance policies, Debtors have few assets. Id. at 676-78. Memorial, at the time of filing for bankruptcy, had the $100,000 advanced by EHI under the demand note. Id. at 676. Presumably this cash has been spent on litigation and accounting fees related to the bankruptcy. Santa Fe had no cash when it filed for bankruptcy. Id. Neither company holds any real property. Id.
The Debtors asserted a handful of claims for cash as assets in their bankruptcy petitions. Id. at 676-78. Santa Fe claimed a right to $60,000 from a class action settlement arising from a suit against Conoco. Id. at 676. It also claimed approximately $21,000 in escheat-ed funds held by the state of Texas, id., and approximately $500,000 from Memorial for assets that were upstreamed to Memorial upon its liquidation, id. at 677. Memorial listed an intercompany tax refund claim against an affiliate for $5,722. Id. at 676. The Debtors also claimed a right to indemnity in the Tebow Action “to reduce the extent of [their] exposure were someone else to be successful in recovering on a claim against [them] within [the] scope of the matters for which [they] are entitled to indemnity and/or contribution.” Id. Finally, the “Debtors ... assertfed] that all claims that BEPCO seeks to assert against the GSF Entities arising out of or related to the Tebow Action on the basis of alter ego, veil piercing or single business enterprise or similar theories ... [we]re property of their estates.” Id. at 677.

The Debtors’ Reasons for Filing for Bankruptcy

The Debtors filed their Chapter 11 bankruptcy petitions because they were concerned about their ongoing and pending litigations. In particular, they “considered the wearing effect of piecemeal litiga *616 tion involving one case after another over a possible finite pot of money; the ability to obtain jurisdiction over a geographically disparate group of claimants (located in Texas, Oklahoma, Louisiana and California, among other states); and possible multiple claims on the same insurance policies and the problem of dividing up the proceeds of such policies among multiple claimants.” Id. at 677-78. Ultimately, though, the Tebow Action was the “principal factor” in the Debtors’ decisions to file for bankruptcy. Id. at 678. The Debtors were unsure of whether Santa Fe would be able to assert a dissolution defense because of its defective notice of dissolution. They feared alter ego liability for Memorial and the GSF Entities. Id.

The Procedural History Leading to this Appeal

On February 15, 2008, the Bankruptcy Court denied BEPCO’s motion to dismiss the Debtors’ petitions for lack of good faith and on April 16, 2008, denied BEPCO’s motion for reconsideration. On April 28, 2008, BEPCO appealed to the United States District Court for the District of Delaware. On January 27, 2009, the District Court reversed and remanded the case, concluding that the Debtors’ petitions should be dismissed for lack of good faith. On February 9, 2009, the Debtors filed their timely notice of appeal to this Court.
II.
The Bankruptcy Court’s refusal to dismiss a Chapter 11 bankruptcy petition for want of good faith is reviewed for an abuse of discretion. NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.), 384 F.3d 108, 118 (3d Cir.2004). “‘[A]n abuse of discretion exists where the district court’s decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact.’ ” Id. (quoting Official Comm. of Unsecured Debtors v. Nucor Corp. (In re SGL Carbon Corp.), 200 F.3d 154, 159 (3d Cir.1999)). “[W]e review the findings of fact leading to the decision for clear error and exercise plenary review over the [district] court’s conclusions of law.” In re SGL Carbon Corp., 200 F.3d at 159.
The issue in this appeal, whether the undisputed facts support the Bankruptcy Court’s determination that the Debtors filed their bankruptcy petitions in good faith, calls for reviewing the Bankruptcy Court’s application of law to the facts of this case. Such review requires analyzing not only basic and inferred facts, which are subject to clearly erroneous review, but also ultimate fad® — facts that are “usually expressed in the language of a standard enunciated by case-law rule or by statute, e.g., an actor’s conduct was negligent; the injury occurred in the course of employment; the rate is reasonable; the company has refused to bargain collectively.” Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 102 (3d Cir.1981) (quoting Smith v. Harris, 644 F.2d 985, 990 n. 1 (3d Cir.1981) (Aldisert, J., concurring)). Ultimate facts are “conclusion[s] of law or at least ... determination[s] of ... mixed question[s] of law and fact.” Id. The determination of whether the basic and inferred facts of a case support the conclusion of good faith in the filing of a Chapter 11 bankruptcy petition, i.e., whether the application of law to fact was proper, is reviewed as an ultimate fact and is subject to plenary review because it is, essentially, a conclusion of law. Universal Minerals, Inc., 669 F.2d at 102; see also In re SGL Carbon Corp., 200 F.3d at 159.
The District Court correctly exercised plenary review, but it misread authority in reaching its conclusion that plenary review *617 was appropriate. It stated, citing In re Hechinger Investment Co. of Delaware, 298 F.3d at 224, and In re Telegroup, Inc., 281 F.3d at 136, that its “responsibilities [we]re ... informed by the directive of [this Court], which effectively reviews on a de novo basis bankruptcy court opinions.” In re 15375 Mem.’l Corp. III, 400 B.R. at 423 (citations omitted). The District Court’s reliance on these cases was misplaced. In these cases we stated only that our review “effectively amounts to review of the [Bankruptcy [CJourt’s opinion in the first instance.” In re Hechinger Inv. Co. of Del., 298 F.3d at 224 (citation omitted). In other words, “[b]ecause the District Court sat below as an appellate court, [we] conduct[] the same review of the Bankruptcy Court’s order as did the District Court.” In re Telegroup, Inc., 281 F.3d at 136 (citation omitted). Nowhere did we state that we apply plenary review to all bankruptcy court decisions regardless of the issues raised. At all events, this error by the District Court was harmless.
The Debtors raise three objections to plenary review of the good faith inquiry. First, they assert that the District Court improperly departed from the Bankruptcy Court’s findings of fact without concluding that those facts were clearly erroneous. Thus, according to the Debtors, the District Court’s conclusion that the Debtors’ lacked good faith cannot stand. Because we disagree with the Debtors’ premise, we must reject their conclusion. Aside from finding no clear error in the Bankruptcy Court’s findings of fact, In re 13575 Mem’l Corp. III, 400 B.R. at 423 n. 4, the District Court’s opinion was peppered with citations to the Bankruptcy Court’s fact finding. The District Court departed from the Bankruptcy Court’s decision only in its determinations of ultimate facts. Because its review of those determinations was plenary, it was free to do so.
Second, the Debtors claim that an abuse of discretion can occur only when no reasonable person would adopt the Bankruptcy Court’s determination of the good faith inquiry. In support of their view, the Debtors rely on Solow v. PPI Enterprises (U.S.), Inc. (In re PPI Enterprises (U.S.), Inc.), 324 F.3d 197 (3d Cir.2003), but that decision only stated that “[a]n abuse of discretion can occur when no reasonable person would adopt ... the [bankruptcy court’s] view,” id. at 211 (emphasis added) (quoting Rode v. Dellarciprete, 892 F.2d 1177, 1182 (3d Cir.1990)). That case does not hold that an abuse of discretion can only occur under those circumstances. Indeed, in In re PPI Enterprises (U.S.), Inc., this Court followed In re SGL Carbon Corp., explaining that “abuse exists [where there is a] clearly erroneous finding of fact, errant legal conclusionf ], or improper application of fact to law.” 324 F.3d at 211 (citing In re SGL Carbon Corp., 200 F.3d at 159).
Third, the Debtors make much of the District Court’s failure to explicitly declare that “the Bankruptcy Court improperly applied the law to the facts,” using those precise words. We fail to see the significance of the Debtors’ argument. Regardless of whether the District Court used those exact words, its reasoning compels the conclusion that the Bankruptcy Court improperly applied the law to the facts. After “[examining the facts in totality,” In re 13575 Mem.’l Corp. III, 400 B.R. at 429, and without disturbing the Bankruptcy Court’s factual findings, id. at 423 n. 4, the District Court concluded that the Debtors’ filings lacked good faith, id. at 429. In particular, the District Court identified the questions relevant to the good faith inquiry and determined that (1) the “record does not support the conclusion that [the] Debtors’ petitions have captured value for the estates that otherwise would have been *618 lost” and that (2) “the record supports the conclusion that [the] Debtors’ primary objective in filing the petitions was to gain a tactical advantage in litigation.” Id. Both of these determinations were based on applications of law to fact and, therefore, were correctly subject to plenary review.
In sum, while the District Court cited the wrong authority, it correctly determined the standard of review. Its mistake was harmless error. The proper standard of review for the ultimate determination of good faith is plenary where the review pertains to whether the Bankruptcy Court made an improper application of law to fact.
III.
Chapter 11 bankruptcy petitions are “subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith and the burden is on the bankruptcy petitioner to establish [good faith].” In re Integrated Telecom Express, Inc., 384 F.3d at 118 (citations omitted). “Whether the good faith requirement has been satisfied is a ‘fact intensive inquiry’ in which the court must examine ‘the totality of facts and circumstances’ and determine where a ‘petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.’ ” Id. (quoting In re SGL Carbon Corp., 200 F.3d at 162).[7] We “focus[ ] on two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose” and “(2) whether the petition is filed merely to obtain a tactical litigation advantage.” Id. at 119-20 (citing In re SGL Carbon Corp., 200 F.3d at 165).[8]
*619 In this case, both inquiries compel dismissal of the Debtors’ bankruptcy petitions for lack of good faith. The petitions do not serve the valid bankruptcy purposes of preserving a going concern or maximizing the values of the Debtors’ estates. Moreover, the timing of the filing of the bankruptcy petitions shows that the Debtors were not seeking Chapter 11 protection for a valid bankruptcy purpose, but instead were using the filings as a litigation tactic to avoid liability in the Tebow Action and to protect the GSF Entities. Thus, based on the “totality of facts and circumstances” we conclude that the Debtors’ bankruptcy petitions were not filed in good faith. See id. at 118 (quoting In re SGL Carbon Corp., 200 F.3d at 162).
A.
A party filing for Chapter 11 bankruptcy may prove that its petition served a valid bankruptcy purpose by showing that the petition “preserved] a going concern or maximiz[ed] the value of the debtor’s estate[.]” In re Integrated Telecom Express, Inc., 384 F.3d at 120 (citing In re SGL Carbon Corp., 200 F.3d at 165); see Bank of Am. Nat’l Trust & Sav. Ass’n v. 203 N. LaSalle St. P’ship, 526 U.S. 434, 453, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999); Toibb v. Radloff, 501 U.S. 157, 163-64, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991). The Debtors, recognizing that they have no going concerns to preserve — no employees, offices, or business other than the handling of litigation— focus their arguments on the latter inquiry.
“To say that liquidation under Chapter 11 maximizes the value of an entity is to say that there is some value that otherwise would be lost outside of bankruptcy.” In re Integrated Telecom Express, Inc., 384 F.3d at 120 (citing Elizabeth Warren, Bankruptcy Policymaking in an Imperfect World, 92 Mich. L.Rev. 336, 350 (1993)). The Bankruptcy Court identified eleven purported benefits of filing for bankruptcy that it believed maximized the values of the Debtors’ estates. It believed that filing the bankruptcy petitions permitted the Debtors to:
(a) assert[] the automatic stay in connection with the Tebow, Ellison[,] Harris, Sinz, Troia, Boudreaux Actions, and other matters, to limit the estate’s involvement in litigation other than in this Bankruptcy Court;
(b) facilitate!] dismissal of Debtors as defendants from the Ellison, Harris, Te-bow, Sinz and Troia Actions and, again, to centralize these claims in the Bankruptcy Court forum;
(c) establish!] a bar date to set the number of claims [and] fix[] the notice problem that existed with respect to Santa Fe’s dissolution;
(d) ... create[ ] a known universe of claims;
(e) analyze[] the BEPCO claims to be able to file a motion contesting whether BEPCO ha[d] any legally cognizable claim at all against Debtors;
(f) take[] advantage of the breathing spell afforded by bankruptcy to inventory and analyze potentially applicable insurance policies and related information;
(g) pursuant to the Insurance Review Projeet[,] discovert ] the London Market Policies, which appear to provide coverage for legacy cases (including the Te-bow related claims) and other insurance policies that may respond to other *620 claims in the Bankruptcy Cases (Sinz and Troia);
(h) commence[ ] and continue[ ] substantive communications with insurers, including those identified in connection with the Tebow Action and those subsequently identified pursuant to the Insurance Review Project;
(i) negotiate!] and propose!] a settlement of issues with the GlobalSantaFe Entities under which, inter alia, they will continue to cooperate in the pursuit of insurance rights and will contribute well over $1,000,000 in cash and other value so that substantial value can be delivered to all the creditors of the estates on their claims;
(j) formulate! ] the [Liquidation] Plan; and
(k) continue to manage and search for assets.
In re 15375 Mem’l Corp. I, 382 B.R. at 685. At first blush, this may appear an extensive list of activities designed to maximize the Debtors’ estates. Closer examination, however, reveals that the purported benefits identified did not add or preserve value that would otherwise be unavailable to creditors outside of bankruptcy. In re Integrated Telecom Express, Inc., 384 F.3d at 120; In re SGL Carbon Corp., 200 F.3d at 165 (requiring “Chapter 11 petitioners to act within the scope of the bankruptcy laws to further a valid reorganizational purpose” to satisfy the good faith filing requirement).
The first purported benefit amounts to nothing more than the Debtors availing themselves of the automatic stay of litigation outside of bankruptcy. “The protection of the automatic stay,” however, “is not per se a valid justification for a Chapter 11 filing; rather, it is a consequential benefit of an otherwise good faith filing.” In re Integrated Telecom Express, Inc., 384 F.3d at 128 (quoting In re HBA East, Inc., 87 B.R. 248, 262 (Bankr. E.D.N.Y.1988)). As such, “courts universally demand more of Chapter 11 petitions than a naked desire to stay pending litigation,” and any perceived benefit of “‘the automatic stay, without more, cannot convert a bad faith filing to a good faith one.’ ” Id. (quoting In re HBA East, Inc., 87 B.R. at 262). More generally, the “desire to take advantage of the protections of the Code,” such as the automatic stay of litigation outside of bankruptcy, “cannot establish good faith as a matter of law” given “the truism that every bankruptcy petition seeks some advantage offered in the Code [and that] any other rule would eviscerate any limitation that the good faith requirement places on Chapter 11 filings.” Id.
The second purported benefit was the centralization of claims and the consolidation of litigations into a single forum. According to the Bankruptcy Court, the Debtors’ petitions served a valid bankruptcy purpose by “facilitat[ing] an orderly liquidation of claims and assets of [the Debtors’ estates] in a central forum.” In re 15375 Mem’l Corp. I, 382 B.R. at 683 (citation omitted). It is true that, at its most basic level, bankruptcy is designed to handle the distribution problems arising when the system of individual creditor remedies harms the creditors as a group and there are not enough assets to go around. In re Integrated Telecom Express, Inc., 384 F.3d at 121 (citing Thomas H. Jackson, The Logic and Limits of Bankruptcy Law 10 (1986)). That distribution problem is not implicated in this case. The majority of the Debtors’ potential liabilities lay in the Sinz, Troia, and Tebow Actions. The Debtors face up to approximately $330 million in liabilities from those cases, with the Tebow Action accounting for the bulk of the potential *621 liability, $320 million.[9] The other proofs of claim amount to just over $500,000 and indemnity rights.[10] The Debtors basically have no cash and approximately $85,000 in claims for cash from entities besides the GSF Entities. In re 15375 Mem’l Corp. I, 382 B.R. at 676. Obviously these limited assets cannot cover the substantial liabilities the Debtors face. The Debtors do, however, have insurance policies that cover the Tebow Action, id. at 672, and other insurance policies that may cover the Sinz and Troia Actions, id. at 690. It is “undisputed that if coverage exists for the claims of the Sinz and Troia plaintiffs ..., it will arise under insurance policies separate and distinct from those [that] provide coverage for BEPCO’s claims.” Id. These insurance policies, therefore, are the Debtors’ most valuable assets since they, at a minimum, cover the Tebow Action, the Debtors’ most significant potential liability. As such, a central forum for distribution adds little value to the Debtors’ estates because the Debtors’ insurance policies cannot be used to pay for liabilities that the policies do not cover. In sum, given that three of the four[11] active litigations against the Debtors, the Sinz, Troia, and Tebow Actions, are likely covered by non-overlapping insurance policies, id., and that those litiga-tions dwarf the other proofs of claim in size, id. at 670-72, centralization of claims in a single forum does not implicate the basic distribution problem bankruptcy was designed to resolve.
Furthermore, looking at all the proofs of claim filed at the time of the Bankruptcy Court’s decision on February 15, 2008, it appears that the vast majority of them, minus the six tax claims filed by the state of Texas that the Debtors claim are not their obligations, are somehow related to the Sinz, Troia, and Tebow Actions, id., and may be covered by insurance, further mitigating the need for bankruptcy. Two proofs of claim were filed in connection with the Sinz and Troia Actions, and the balance of the proofs of claim appear to relate to the Tebow Action: three were filed by attorneys and expert witnesses for services provided in connection with Santa Fe’s defense in the Tebow Action; six were filed by the GSF Entities for funds provided to file for bankruptcy, id. at 671, which was primarily motivated by the Te-bow Action, id. at 678, and indemnity rights for, among other things, protection from alter ego claims in the Tebow Action, id. at 671; and two were filed by BEPCO in connection with the Tebow Action, id. at 670.
In addition, the insurance policies are and have always been available outside of bankruptcy without detrimentally impacting any creditor’s recovery. Thus, like the petitioner in In re Integrated Telecom Express, Inc., the Debtors cannot identify “assets that [were] threatened outside of bankruptcy ... but that could be preserved or maximized in an orderly *622 liquidation under Chapter 11.” In re Integrated Telecom Express, Inc., 384 F.3d at 122. Moreover, an orderly distribution of assets, standing alone, is not a valid bankruptcy purpose. Id. at 126. “Antecedent to any such distribution is an inquiry [into] whether the petition [was] filed in good faith, i.e., whether [it] serve[d] a valid bankruptcy purpose.” Id. In other words, the creation of a central forum to adjudicate claims against the Debtors is not enough to satisfy the good faith inquiry— the Debtors must show that bankruptcy has some “hope of maximizing the value of the [Debtors’ estates].” Id. Finally, consolidation of litigation was not achieved in this case. The Bankruptcy Court has already permitted piecemeal litigation of BEPCO’s claims against Santa Fe and its insurers in Louisiana state court. Santa Fe Minerals, Inc. v. BEPCO, L.P. (In re 15375 Mem’l Corp. II), 386 B.R. 548, 554 (Bankr.D.Del.2008).
The third and fourth purported benefits identified by the Bankruptcy Court, that filing for bankruptcy “established a bar date to set the number of claims[,] fixed the notice problem that existed with respect to Santa Fe’s dissolution[,]” and “created a known universe of claims,” In re 15375 Mem.’l Corp. I, 382 B.R. at 685, were tied to Santa Fe’s botched dissolution under Wyoming law. “Dissolution ... is not an objective that can be attained in bankruptcy.” In re Integrated Telecom Express, Inc., 384 F.3d at 126 (citation omitted). Moreover, neither the Bankruptcy Court nor the Debtors explained how the establishment of a bar date maximized the Debtors’ estates. At the time of filing their bankruptcy petitions the Debtors knew of only six litigations in which they could conceivably have been held liable for damages, and only a handful of creditors have filed proofs of claim in the Debtors’ bankruptcy proceedings. Without some risk of significant liability from a substantial number of litigations or claimants in bankruptcy, it is difficult for this Court to assign much value to the mere fact that a bar date was established and a known universe of claims was created. Also, we reiterate that the “desire to take advantage of the protections of the Code cannot establish ... good faith,” id. at 128, so the establishment of a bar date for claims under the Bankruptcy Code to remedy Santa Fe’s failure to publish notice of its dissolution under Wyoming law, which, if done properly, would have established a bar date back in 2003, does not evidence good faith.
Next, the Bankruptcy Court claimed that bankruptcy enabled the Debtors to analyze BEPCO’s claims and “file a motion contesting whether BEPCO has any legally cognizable claim ... against [them.]” In re 15375 Mem’l Corp. I, 382 B.R. at 685. The mere fact that the Bankruptcy Court provided a forum to adjudicate the dispute between BEPCO and the Debtors is not a benefit of bankruptcy— the same adjudication could have occurred, and in fact, is currently occurring, in Louisiana state court. On February 15, 2008, the Bankruptcy Court granted BEPCO relief from the automatic stay so that it could pursue its claims against Santa Fe and Sante Fe’s insurers in Louisiana state court. Id. at 686-92. The Bankruptcy Court permitted that claim to proceed because, among other things, the Louisiana state court action allowed BEPCO to vigorously “pursue all of its rights” to insurance proceeds instead of having to wait for Santa Fe to assert those rights. Id. at 692; see In re 15375 Mem’l Corp. II, 386 B.R. at 554 (noting that Louisiana was the proper forum for the claims because “[t]he claims involve[d] state law issues addressing liability for contamination of groundwater and soil in Louisiana”). In effect, *623 the Bankruptcy Court did nothing more than permit BEPCO’s Louisiana state action, which was stalled by the Debtors’ bankruptcy filings and the subsequent automatic stay, to go forward. This is not a benefit of bankruptcy, and it did not maximize the value of the Debtors’ estates.
Three other purported benefits pertained to the insurance policy review. The Debtors purportedly availed themselves “of the breathing spell afforded by bankruptcy to inventory and analyze potentially applicable insurance policies and related information,” discovered insurance policies that appear to cover the Tebow, Sinz, and Troia Actions, and “commenced and continued substantive communications with insurers[.]” In re 15375 Mem’l Corp. I, 382 B.R. at 685. First, the review was conducted by GSFCSI, a company that needed no breathing spell because it was not under financial distress and faced no litigation threats. In addition, the review was undertaken for the benefit of all GSF Entities, not just the Debtors. Id. at 673. The pending litigations probably would have necessitated the insurance policy review regardless of the Debtors’ bankruptcies since the overall goal of the review was to locate and categorize all policies and to determine whether the policies protected the Debtors or the GSF Entities. See id. Second, there was absolutely no causal connection between the bankruptcy filings and the insurance policy review. The insurance policy review was neither required by bankruptcy nor impeded outside of bankruptcy, and GSFCSI was free to conduct the review at any time. Third, the value of the insurance policies was not affected by the bankruptcy. Thus, the fact that GSFCSI happened to conduct the review after the Debtors filed for bankruptcy is irrelevant.[12]
Next, the Bankruptcy Court reasoned that bankruptcy permitted the Debtors to negotiate a settlement of issues with the GSF Entities in which the GSF Entities would cooperate in pursuit of insurance rights and would contribute over $1,000,000 so that substantial value could be delivered to the Debtors’ creditors. Id. at 685. First, considering that GSFCSI conducted the insurance review for the benefit of all the GSF Entities, not just the Debtors, id. at 673, it is difficult to consider cooperation in pursuit of insurance rights as a benefit of bankruptcy. The GSF Entities acted out of self interest. They knew of the risks they faced from alter ego claims and realized that the Debtors’ insurance policies could aid them in protecting themselves, so they had an incentive to cooperate on insurance rights wholly independent of bankruptcy. Assuming, hypothetically, that the Debtors never filed for bankruptcy, the GSF Entities would still have had an incentive to cooperate on insurance rights because of the risk of alter ego liability in Louisiana state court. Second, the Bankruptcy Court, in granting BEPCO relief from the automatic stay to bring claims against Santa Fe and Santa Fe’s insurers in Louisiana state court, conceded that the Debtors did not have “the necessary incentive to pursue [their] insurers[.]” Id. at 692. In conceding that point, it negated the purported benefit gained by cooperation between the GSF Entities and the Debtors on insurance rights. If the Debtors lacked the incentive to pursue their insurers, the cooperation of the GSF Entities in that inaction hardly seems beneficial to the *624 Debtors’ estates or the creditors seeking insurance proceeds. Third, the $1,000,000 slated to be contributed by the GSF Entities is not much of a concession in light of their systematic use of the Debtors to protect themselves from litigation liabilities that far exceed their contribution. Moreover, Faure, the decision-maker for the Debtors’ bankruptcies, lacked an incentive to vigorously negotiate on behalf of the Debtors against the GSF entities because doing so “would jeopardize his job.” See id. at 661 (noting that Faure “testified that filing a lawsuit against [GSF] on behalf of the Debtors to facilitate the return of upstreamed funds would jeopardize his job”).
The next purported benefit, the formulation of a liquidation plan, did not maximize the Debtors’ estates. The Debtors must show that the liquidation plan served a valid bankruptcy purpose — the mere creation of a liquidation plan, standing alone, is not enough. In re Integrated Telecom, 384 F.3d at 126. The last purported benefit, that bankruptcy enabled the Debtors to “continue to manage and search for assets[,]” In re 15375 Mem’l Corp. I, 382 B.R. at 685, is unimportant because the Debtors have not conducted any business outside of litigation for several years and have no offices, operations, or employees, id. at 660-62.[13] In addition, the Debtors could have managed and searched for assets without filing for bankruptcy. In fact, filing for bankruptcy has only increased the Debtors’ cash shortfall. At the time of filing for bankruptcy, “[t]he Debtors’ financial condition when viewed on a cash basis [wa]s poor.” Id. at 679. Their condition has only deteriorated as substantial bankruptcy-related administrative expenses, including legal fees and fees owed to GSFCSI for support services, have accrued. Id. at 679-80. In short, the Debtors could have managed and searched for assets without filing for bankruptcy and without incurring bankruptcy-related administrative expenses.
Having considered each of the purported benefits identified by the Bankruptcy Court as justifying the Chapter 11 filings, we turn to an issue that the Bankruptcy Court failed to consider in its good faith analysis: the Debtors’ representative was primarily concerned with protecting the GSF Entities, not the Debtors.[14], Faure, the principal decision-maker guiding the Debtors’ bankruptcies, was inextricably entangled in numerous aspects of the GSF Entities’ operations. Aside from handling the Debtors’ bankruptcies, Faure was also employed by GSFCSI as vice president, assistant general counsel, and assistant secretary, and acted as vice president and assistant secretary of EHI. Id. at 661 Faure’s mixed allegiances prevented him from adequately protecting the Debtors’ interests. For example, Faure’s negotiations with EHI, a company for which he was the vice president and assistant secretary, on the terms of the demand note amounted to a litany of concessions by Memorial that insulated the GSF Entities from any liability. Id. at 668-69. Memorial stood to gain nothing from the demand note except the ability to pay the costs of *625 filing for bankruptcy — and the bankruptcy itself, as explained in the next section, was a litigation tactic to protect the GSF Entities. Also, the Debtors’ decision to file for bankruptcy was not their own; GSF was ultimately in control of whether the Debtors filed. Leading up to the filings, Faure reported to McCullough, GSF’s senior vice president and general counsel, on legal matters relating to Memorial and he had to receive approval from McCullough to file the Debtors’ bankruptcy petitions. Id. at 661. Finally, Faure testified at trial that “filing a lawsuit against [GSF] on behalf of the Debtors ... would jeopardize his job.” Id. Even if Faure had wanted to act in the Debtors’ interests, he did not consider himself free to do so because it would have placed his job at risk.
In sum, the Debtors’ filing for bankruptcy did not maximize the value of their estates. Indeed, it would be exceedingly difficult to do so where neither Santa Fe nor Memorial had any real assets to preserve besides various insurance policies. The purported benefits to the Debtors’ estates identified by the Bankruptcy Court either had no causal connection to filing for bankruptcy, ie., they were events that could have occurred outside of bankruptcy, or were based on procedural benefits gained from bankruptcy that cannot be said to have maximized the value of the Debtors’ estates. As such, we conclude that the Debtors’ petitions failed to serve a valid bankruptcy purpose.
B.
In addition to failing to serve a valid bankruptcy purpose, the timing of the Debtors’ bankruptcy petitions shows that they were filed primarily as a litigation tactic to avoid liability in the Tebow Action. “[F]iling a Chapter 11 petition merely to obtain tactical litigation advantages is not within the legitimate scope of the bankruptcy laws[.]” In re SGL Carbon Corp., 200 F.3d at 165 (internal quotation omitted); accord In re Integrated Telecom Express, Inc., 384 F.3d at 120. Where “the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith.” In re SGL Carbon Corp., 200 F.3d at 165 (quoting In re HBA East, Inc., 87 B.R. at 259-60).[15]
In this case, the Bankruptcy Court found that the “Tebow Action was the principal factor ” in the Debtors’ filing for bankruptcy. In re 15375 Mem’l Corp. I, 382 B.R. at 678 .(emphasis added). Debtors filed their petitions on August 16, 2006, roughly two months before trial in the Tebow Action and shortly after BEPCO and the Tebow Plaintiffs informed Santa Fe that they would pursue the GSF Entities under an alter ego theory. Id. at 667. At that time, discovery in the Tebow Action was already complete and expert reports showed that Santa Fe’s contamination of the East Pit area of the Tebow Property was a significant part of the overall contamination of the property. Id. at 664. The Debtors were worried that their dissolution defense would fail, id. at 667, exposing them to at least $189 million in damages, id. at 664, and filed their bankruptcy petitions with the knowledge that doing so would result in their dismiss *626 al from the Tebow Action and would shield the GSF Entities from litigation, id. at 665. Given this mix of facts and the Debtors’ sudden decision to file for bankruptcy despite their having been dormant and without employees or offices for several years, we cannot escape the conclusion that the filings were a litigation tactic.
Considering the results of the Debtors’ bankruptcy filings, the tactical advantages gained by the Debtors and the GSF Entities against BEPCO are obvious. The Debtors’ bankruptcy filings protected the GSF Entities from liability for the damage to the Tebow Property. Indeed, the Debtors continue to argue that any alter ego claims against the GSF Entities are part of their estates and cannot be asserted by BEPCO, while simultaneously, and incongruously, stating that they believe that any such claims would have no value. See id. at 677. If the Debtors and the GSF Entities had their way, BEPCO would be left without any opportunity to litigate its alter ego claims against the GSF Entities and, conveniently for the GSF Entities, the Debtors would not bring the claims because they do not believe the claims have value. Even if the Bankruptcy Court later permits BEPCO to bring its alter ego claims against the GSF Entities in Louisiana state court, BEPCO will have already been prejudiced “to the extent of the lost time value of money for the settlement funds it has already paid out to resolve its liability in the Tebow Action.” Id. at 690. “More critically, BEPCO [will be] prejudiced by the lapse of time in terms of its ability to effectively prosecute its claims” because “[witnesses and documents may become unavailable.” Id.
Taking into account the lack of a valid bankruptcy purpose, the timing of the filings of the petitions, and the tactical advantages gained from the bankruptcy filings by the Debtors and the GSF Entities, we agree with the District Court’s conclusion that the Debtors filed their petitions primarily as a litigation tactic to frustrate BEPCO’s claims against the Debtors and the GSF Entities.
IV.
The Debtors have failed to show that their Chapter 11 bankruptcy petitions served valid bankruptcy purposes because the bankruptcies did not maximize the Debtors’ estates. Moreover, the timing of the Debtors’ filings, two months prior to a trial in which they and the GSF Entities faced substantial liability, show that the bankruptcy petitions were filed primarily as a litigation tactic. Accordingly, we will affirm the District Court’s order to dismiss the Debtors’ bankruptcy petitions for lack of good faith.

. The District Court had subject matter jurisdiction over this bankruptcy appeal under 28 U.S.C. § 158(a), and we exercise jurisdiction under 28 U.S.C. § 158(d). "Because the District Court sat below as an appellate court, [we] conduct[ ] the same review of the Bankruptcy Court’s order as did the District Court.” Baroda Hill Invs., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.), 281 F.3d 133, 136 (3d Cir.2002); accord Former Employees of Builders Square Retail Stores v. Hechinger Inv. Co. of Del. (In re Hechinger Inv. Co. of Del.), 298 F.3d 219, 224 (3d Cir.2002).

. Bass Enterprises Production Co., the appel-lee for the purpose of the good faith issue, argues that the Debtors’ bankruptcy petitions should be dismissed for "cause” under 11 U.S.C. § 1112(b), and that Chapter 11 was unavailable to Santa Fe Minerals, Inc. because it was dissolved before its petition was filed. Those issues need not be addressed in light of our decision to affirm the District Court’s conclusion that the Debtors’ bankruptcy petitions were not filed in good faith.

. The relevant Wyoming statute describing claims permitted against dissolved corporations states:
(a) A dissolved corporation may also publish notice of its dissolution and request that persons with claims against the corporation present them in accordance with the notice.
(b) The notice shall:
(i) Be published one (1) time in a newspaper of general circulation in the county where the dissolved corporation's principal office, or, if none in this state, its registered office, is or was last located;
(ii) Describe the information that shall be included in a claim and provide a mailing address where the claim may be sent; and
(iii) State that a claim against the corporation will be barred unless a proceeding to enforce the claim is commenced within three (3) years or the applicable statute of limitations, whichever is less, after the publication of the notice.
(c) If the dissolved corporation publishes a newspaper notice in accordance with subsection (b) of this section, the claim of each of the following claimants is barred unless the claimant commences a proceeding to enforce the claim against the dissolved corporation within three (3) years after the publication date of the newspaper notice:
(i) A claimant who did not receive written notice under W.S. 17-16-1406;
(ii) A claimant whose claim was timely sent to the dissolved corporation but not acted on; or
(iii) A claimant whose claim is contingent or based on an event occurring after the effective date of dissolution.
(d)A claim that is not barred by W.S. 17-16-1406(c) or subsection (c) of this section may be enforced:
(i) Against the dissolved corporation, to the extent of its undistributed assets; or
(ii) Except as provided in W.S. 17-16-1408(d), if the assets have been distributed in liquidation, against a shareholder of the dissolved corporation to the extent of his pro rata share of the claim or the corporate assets distributed to him in liquidation, whichever is less, but a shareholder’s total liability for all claims under this section may not exceed the total amount of assets distributed to the shareholder.
Wyo. Stat. Ann. § 17-16-1407.

. Other individuals holding positions with the Debtors have also held positions in the GSF Entities. In re 15375 Mem.’l Corp. I, 382 B.R. at 661-62. At all times relevant to this appeal, all of Memorial's officers were also officers of EHI and GSFCSI, and all of Memorial’s directors held positions at GSF: one was the president and chief executive officer of GSF, one was the executive vice president and chief operating officer of GSF, and one was the senior vice president of human resources for GSF. Id. at 662. In addition, three EHI directors held positions as GSF officers. Id.

. Faure explained McCullough’s role in the operation of EHI, Memorial, and Santa Fe during his cross examination at trial:
Q: And [McCullough is] someone that you typically report to in the course of your duties, isn’t [he]?
A: Correct.
Q: And do you also take direction from him from time to time?
A: From time to time, yes.
Q: Do you take direction from him in connection with matters related to Memorial?
A: I’ve taken legal advice from him, especially pre-petition. But post-petition we’ve had separate counsels for Memorial and the GSF entities.
Q: So it's your testimony that since the filing of the bankruptcy cases he has never given you any manner of direction as to what Memorial should or should not be doing?
A: Correct.
Q: And you were also reporting and taking direction from him during the pendency of the [Tebow] litigation. Is that the case?
A: Correct.
Q: And when you were preparing for these bankruptcy cases and the filing of these cases did you also have occasion to consult with [McCullough]?
A: Yes, I did.
Q: And did he provide direction on matters relating to the anticipated filing of the bankruptcy cases?
A: Well, he approved the filing. I needed his approval to file.
Q: He authorized it, right?
A: Correct.

. During cross-examination, Faure testified as follows:
Q: [I]s your understanding of the meaning of romanette (i): “If valid, that Memorial has agreed to assume responsibility for all the liabilities of Santa Fe Minerals”?
A: Says: “As consideration for the issuance of this note, maker agrees that, one, it accepts all liabilities existing or arising from activities of Santa Fe Minerals, Inc., a dissolved subsidiary of maker.” So whatever liabilities remained and existed were kept on the Memorial side of this transaction.
Q: Assumed by Memorial, were they not?
A: Hmm?
Q: Under the terms of this note, assumed by Memorial?
A: Correct, and not transferred to [EHI],

. Almost every federal Court of Appeals follows some variation of this approach to the good faith filing requirement for Chapter 11 petitions. See, e.g., Trident Assocs. Ltd. P'ship v. Metro. Life Ins. Co. (In re Trident Assocs. Ltd. P’ship), 52 F.3d 127, 130-31 (6th Cir.1995) (explaining that petition may be dismissed for lack of good faith under 11 U.S.C. § 1112(b) based on the totality of the circumstances); Marsch v. Marsch (In re Marsch), 36 F.3d 825, 828 (9th Cir.1994) (same); Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.), 849 F.2d 1393, 1394-95 (11th Cir.1988) (same); Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.), 779 F.2d 1068, 1072-73 (5th Cir.1986) (noting that petition may be dismissed under 11 U.S.C. § 1112(b) and listing "a conglomerate of factors” that should be considered); First Nat’l Bank of Sioux City v. Kerr (In re Kerr), 908 F.2d 400, 404 (8th Cir.1990) (explaining that petition may be dismissed under 11 U.S.C. § 1112(b) if debtor had a "pattern of concealment, evasion, and direct violations of the Code or court order which clearly establishes an improper motive”); C-TC 9th Ave. P’ship v. Norton Co. (In re C-TC 9th Ave. P’ship), 113 F.3d 1304, 1310-12 (2d Cir.1997) (dismissing petition based on numerous factors); Carolin Corp. v. Miller, 886 F.2d 693, 700-01 (4th Cir.1989) ("requiring] that both objective futility and subjective bad faith be shown in order to warrant dismissals for want of good faith”).

. Notably, these inquiries are based more on objective analysis of whether the debtor has sought to step outside the "equitable limitations” of Chapter 11 than the subjective intent of the debtor:
The term "good faith” is somewhat misleading. Though it suggests that the debt- or’s subjective intent is determinative, this is not the case. Instead, the "good faith” filing requirement encompasses several, distinct equitable limitations that courts have placed on Chapter 11 filings. Courts have implied such limitations to deter filings that seek to achieve objectives outside the legitimate scope of the bankruptcy laws.
In re SGL Carbon Corp., 200 F.3d at 165 (quoting In re Marsch, 36 F.3d at 828). That being said, the good faith analysis ultimately is based on the "the totality of facts and circumstances,” so the subjective intent of the debtor may play a role in a court's determination of good faith. In re SGL Carbon Corp., 200 F.3d at 165. In other words, our focus on whether there is a valid bankruptcy purpose and whether the filing was made as a litigation tactic is not intended to limit consideration of other facts and circumstances. Id. at 166 n. 16. "Indeed, 'no list is exhaustive of *619 all the factors which could be relevant when analyzing a particular debtor’s good faith.' " Id. (quoting Laguna Assocs. Ltd. P'ship v. Aetna Cas. & Sur. Co. (In re Laguna Assoc. Ltd. P’ship), 30 F.3d 734, 738 (6th Cir.1994)).

. The Sinz and Troia plaintiffs both filed proofs of claims for $5 million, In re 15375 Mem’l Corp. I, 382 B.R. at 670-71, and the Tebow Plaintiffs are seeking $320 million in damages, id. at 664.

. The other proofs of claim consist of: (1) six tax claims by the state of Texas which the Debtors assert are not their obligations; (2) three claims, totaling $60,163.03, for services rendered in connection with defending Santa Fe in the Tebow Action; and (3) six claims by the GSF Entities for approximately $455,000 and the right to indemnity should they be held liable for the Debtors' liabilities under an alter ego theory. In re 15375 Mem'l Corp. I, 382 B.R. at 670.

. We exclude the Dore Action because the Debtors were not named as defendants and the Ellison Action because it was dismissed for reasons unrelated to the Debtors’ bankruptcy filings. In re 15375 Mem’l Corp. I, 382 B.R. at 669.

. The Debtors' claim that conducting the insurance review in-house was less expensive than hiring an outside consultant, thereby benefitting their creditors, fails for the same reason — there was no causal connection between the bankruptcy and the insurance policy review.

. See In re Little Creek Dev. Co., 779 F.2d at 1073 (noting that filings that lack good faith "generally [involve companies that have] no employees ..., little or no cash flow, and no available sources of income to sustain a plan of reorganization”); In re C-TC 9th Ave. P’ship, 113 F.3d at 1311 (same).

. While this appeal does not involve a breach of fiduciary duty claim against the debtor in possession, In re Insilco Tech., Inc., 480 F.3d 212, 215 n. 3 (3d Cir.2007) (noting that debtor in possession is "bound by all of the fiduciary duties of a bankruptcy trustee”), similar concerns are relevant to the good faith inquiry.

. See In re C-TC 9th Ave. P'ship, 113 F.3d at 1311 (noting that where “the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor’s secured creditors to enforce their rights, this can bolster a conclusion of lack of good faith”); In re Phoenix Piccadilly, Ltd., 849 F.2d at 1394-95 (same); see also In re Little Creek Dev. Co., 779 F.2d at 1073 (explaining that happenings in state court litigation are relevant to the good faith analysis).